**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NATIONAL CREDIT UNION** | ) | |
| **ADMINISTRATION BOARD,** | ) | **CASE NO.  1:11 CV 1739** |
| **as Liquidating Agent of** | ) | |
| **St. Paul Croatian Federal Credit Union,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MAGISTRATE JUDGE GREG WHITE** |
| **v.** | ) | |
| | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| **CUMIS INSURANCE SOCIETY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter is before the Court for consideration of (1) Plaintiff National Credit Union Administration Board, as Liquidating Agent of St. Paul Croatian Federal Credit Union's Motion for Summary Judgment (Doc. No. 90); and, (2) Defendant CUMIS Insurance Society's Motion for Summary Judgment[1] (Doc. No. 88.)

For the following reasons, Plaintiff's Motion for Summary Judgment (Doc. No. 90) is DENIED; and, Defendant CUMIS's Motion for Summary Judgment (Doc. No. 88) is DENIED.

---

[1] This case is before the Court upon consent of the parties entered November 28, 2011. (Doc. No. 13.)

I.      **Procedural Background**

On August 18, 2011, Plaintiff National Credit Union Administration Board, as Liquidating Agent of St. Paul Croatian Federal Credit Union (hereinafter "Plaintiff" or "Liquidating Agent") filed a Complaint against Defendant CUMIS Insurance Society (hereinafter "Defendant" or "CUMIS").  (Doc. No. 1.)  Therein, Plaintiff alleges that, on April 30, 2010,[2] the National Credit Union Administration Board placed the St. Paul Croatian Federal Credit Union (hereinafter "St. Paul") into involuntary liquidation due to insolvency and appointed itself the Liquidating Agent pursuant to 12 U.S.C. ¶ 1787(a)(1)(A).  *Id*. at ¶ 6.  As Liquidating Agent, Plaintiff asserts it "assumed all right, title and interest of St. Paul by operation of law."  *Id*. at ¶ 7.  The Complaint contains one count, seeking a declaratory judgment that CUMIS owes coverage under a fidelity bond it issued to St. Paul for losses arising from employee or director dishonesty.  *Id*. at ¶¶ 8-19, 32-34.  CUMIS filed its Answer on October 24, 2011.  (Doc. No. 3.)

A case management conference was conducted on November 29, 2011, at which time the Court set a discovery deadline of September 1, 2012 and a dispositive motions deadline of October 1, 2012.  (Doc. No. 14.)  These deadlines were extended no less than seven times, in large part due to the parties' numerous discovery disputes.[3]  Ultimately, the discovery deadline

---

[2] In the Complaint, Plaintiff alleges the National Credit Union Administration Board placed St. Paul into involuntary liquidation and appointed itself the Liquidating Agent on May 1, 2010.  (Doc. No. 1 at ¶ 6.)  The Notice of Involuntary Liquidation and Revocation of Charter attached as an Exhibit to the Complaint, however, is dated April 30, 2010.  (Doc. No. 1-1 at 3.)  For purposes of this Opinion, the Court will assume that April 30, 2010 is the correct date.

[3] The docket reflects the Court conducted conferences with counsel regarding discovery disputes on nine (9) separate occasions between July 2012 and May 2014.  *See* Doc. Nos. 20, 32, 34, 36, 42, 51, 55, 59, 63.  In addition, the parties filed three discovery related motions and/or

was extended to July 28, 2014 and the dispositive motions deadline was extended to October 29, 2014.  *See* Non-Document Order dated April 15, 2014; Doc. No. 71.

The parties timely filed cross motions for summary judgment on October 29, 2014. (Doc. Nos. 88, 90.)  Briefs in Opposition were filed on December 5, 2014, and replies were filed on December 22, 2014.  (Doc. Nos. 97, 98, 99, 100.)

## II.    **Factual Background**

St. Paul Croatian Federal Credit Union was established in 1943 to serve members of St. Paul Croatian Parish.  (Doc. No. 98-4 at 3.)  *See also* Material Loss Review of St. Paul Croatian Federal Credit Union, National Credit Union Administration, Office of Inspector General Report # OIG-10-16 (hereinafter "OIG Report") at p. 4 (Oct. 7, 2010).  It began with a small branch office in Cleveland.  (Raguz Depo. at Tr. 18-20, 23-25.)

In 1989, Anthony Raguz ("Raguz") was hired by St. Paul to work as a teller and loan officer.  (Raguz Depo. at Tr. 4-15.)  At that time, there were three people working in the Cleveland branch: Joe Plavac; Debbie Politi; and, Mr. Raguz.  *Id*. at Tr. 14.  Mr. Plavac served as the manager.  *Id*.  In 1996, Mr. Plavac retired and Mr. Raguz became the "guy in charge."[4]  *Id.* at Tr. 16.  By this time, the Cleveland branch had hired several additional tellers, bringing the total number of employees up to five.  *Id.*

Around this same time, St. Paul opened a branch in Eastlake, Ohio.  *Id.* at Tr. 16-18.

_____

motions to compel.  *See* Doc. Nos. 44, 73, 75.

[4] Mr. Raguz described his responsibilities as follows: "Everything.  I hired. I fired. I prepared all the income statements.  Everything but the teller work." (Raguz Depo. at Tr. 19.) He was later given the title Chief Operating Officer ("COO").  *Id*. at 146.  Mr. Raguz testified "[t]he title was just the French dressing.  I was the guy in charge."  *Id.*

3

Initially, the Eastlake branch was relatively small, employing only two people.  *Id*. at Tr. 18.  It grew, however, and, sometime between 2000 and 2002, St. Paul obtained a larger space for its Eastlake branch.  At that time, three employees remained in the Cleveland branch while the Eastlake branch expanded to four tellers and two to three customer service people.  *Id*. at Tr. 18-19, 22-24.  Mr. Raguz testified Ms. Politi was the "office manager" of the Cleveland branch, while Mirjana Zovkic became the "office manager" of the Eastlake branch.[5]  *Id*. at Tr. 18-24.

At some point in 2000, Mr. Raguz began making fraudulent loans; i.e., accepting bribes in exchange for authorizing loans.  *Id.* at Tr. 28-30.  Mr. Raguz testified that, at first, only approximately 5 to 10% of the credit union's loans were fraudulent.  *Id*. at Tr. 34-36.  However, he stated "it got progressively more as time went on."[6]  *Id*. at Tr. 36.  In order to conceal his fraudulent conduct, Mr. Raguz sought to avoid reporting loans as delinquent since delinquent loans had to be identified in reports submitted to the National Credit Union Administration ("NCUA")  *Id*. at Tr. 40-41, 46-47.  Mr. Raguz employed a variety of practices to accomplish this goal.

Mr. Raguz used the term  "cover" to describe one such practice.  *Id.* at Tr. 38.  In order to "cover"  a loan, Mr. Raguz would create a loan for a fictional person or entity and then use those loan proceeds to make payments on delinquent (or soon to be delinquent) loans, thus preventing them from being reported to the NCUA.  *Id*. at Tr. 38-40, 54-56.  Specifically, Mr. Raguz

---

[5] The nature and scope of Ms. Zovkic's responsibilities as "office manager" are a matter of dispute, as discussed *infra*.

[6] During the sentencing hearing in his criminal case, the Court noted that, between 2002 and the collapse of St. Paul in 2010, Mr. Raguz accepted approximately $1 million in currency and checks as bribes, kickbacks, and gifts from customers who fraudulently obtained loans.  *See United States v. Raguz*, Case No. 1:11cr00008 (N.D. Ohio) (Boyko, J.) (Doc. No. 178 at 13.)

explained "covering" loans as follows:

Q:      * * * You made up loans to cover loan payments?

A:      Yes. Made up fictional business loans, okay, and then use that money to
cover the loans.

Q:      So can you give me an example of how– so Joe Smith would come in and
give you a–

A:      No.  No one came in.  We made up a fictional loan, not a real person, not
a real entity.  Wrote a check.

Q:      Of  $50,000? $100,000?

A:      Maybe even more.  Maybe even a couple hundred thousand dollars.
Then, put the check back in the system and covered all these loans.

Q:      Made payments on the loans that were—

A:      Right.  The other loans that were going delinquent.

*Id.* at Tr. 38-39.  Mr. Raguz "covered" both fraudulent loans (i.e., loans associated with bribes)

as well as legitimate loans that, for one reason or another, were delinquent or about to become

delinquent.  *Id*. at Tr. 39-40.

Mr. Raguz also engaged in a practice he called "resetting" to conceal his fraudulent

scheme.  *Id*. at Tr. 41.  "Resetting" was the process of taking a loan balance plus accrued

interest, and resetting it as a new loan.  *Id*. at Tr. 41-42.  As Mr. Raguz explained:

Q:      And if those loans were going to go delinquent, you would do this
covering process that you're describing?

A:      Yes.  Now, there's two ways we did it.  We either covered it that way, or
we reset it. Resetting is like a refinance.  Basically, take your loan balance
plus all the interest and reload it.  That's the simplest definition.  Principal
balance plus accrued interest and reset it.

Q:      Okay.  So just to give an example, if I had a $10,000 principal balance left
in 2006, and I also have $2,000 of accrued interest, you would reset the

loan at $12,000?

A:      Right, because that would take the interest off the accrual and take you off the delinquency list.

Q:      Wouldn't I be right back on the delinquency list?

A:      In three months, yes, sir.

Q:      What would you do in that example that I gave you?

A:      We kept resetting. Sometimes we covered, and we reset.

*Id.* at Tr. 41-42.

Finally, Mr. Raguz testified he would "burn" a "bad loan" in order to avoid reporting it as delinquent. *Id.* at Tr. 96-97. He described "bad loans" as loans that were not being paid for one reason or another. *Id.* at Tr. 97. Mr. Raguz chose not to write these loans off because it would have required him to adjust the delinquency rates and loan allowance. *Id.* Instead, he "burned" them by making "them disappear through a fraudulent transaction." *Id.*

It is undisputed that Mr. Raguz's fraudulent conduct continued from 2000 up until the collapse of St. Paul in April 2010. It is further undisputed that St. Paul experienced tremendous asset growth during this time period. According to an October 2010 report prepared by Lillie & Company, St. Paul had total assets of $52 million and a loan portfolio of $42 million as of December 31, 2001. (Doc. No. 98-4 at 4.) By March 31, 2010, St. Paul's total assets had grown to $250 million and its loan portfolio to $240 million. *Id.* Moreover, the Lillie & Company report observed that "[d]uring this period, [St. Paul] had virtually no delinquent loans or charge offs." *Id. See also* OIG Report at p. 17 (Oct. 7, 2010) ("In spite of the economic downturn and contrary to other credit unions, St. Paul reported zero loan delinquency and charge-offs from 2004 to 2009.")

6

In its regulatory capacity, the NCUA conducted periodic examinations of St. Paul throughout the relevant time period.[7]  During these examinations, NCUA examiners generally visited St. Paul and reviewed its records.  (Raguz Depo. at Tr. 80-87; Doc. No. 89-1.)  The NCUA thereafter prepared Examination Reports setting forth its analysis of "major risk areas" in St. Paul operations, as well as findings regarding St. Paul's financial condition, the quality of its management, and the "risk of loss to member capital and the National Credit Union Share Insurance Fund."  (Doc. No. 89-1.)  NCUA Examination Reports from 2004 to March 2009 indicated St. Paul consistently reported a zero delinquency rate.  *See* OIG Report at 17; Doc. No. 89-1.  Moreover, in Examination Reports for the period between December 2007 and March 2009, the NCUA found St. Paul had a CAMEL[8] composite rating of 2, which meant it had determined St. Paul to be "fundamentally sound" and "stable" with "[o]nly moderate weaknesses [that] are well within the board of directors' and management's capabilities and willingness to correct."  *See* Doc. No. 90-3 at 21; Appendix A- NCUA's Camel Rating System (CAMEL) at http://www.ncua.gov/Resources/Documents/LCU2007.12ENC.pdf.  These Examination Reports were provided to the St. Paul Board and Supervisory Committee.  (Raguz Depo. at 86-87.)

---

[7]  According to the OIG Report, the NCUA conducted examinations and/or "supervision contacts" of St. Paul on the following dates: December 31, 2004; December 31, 2005; June 30, 2006; September 30, 2006; June 30, 2007; December 31, 2007; December 31, 2008; March 31, 2009; and, December 31, 2009.  *See* OIG Report at p. 28.

[8] The CAMEL rating system is based upon an evaluation of five critical elements of a credit union's operations: Capital Adequacy; Asset Quality; Management; Earnings; and, Liquidity/Asset-Liability Management.  According to the OIG Report, "NCUA uses a CAMEL Rating System to provide an accurate and consistent assessment of a credit union's financial condition and operations.  The CAMEL rating includes consideration of key ratios, supporting ratios, and trends.  Generally, the examiner uses the key ratios to evaluate and appraise the credit union's overall financial condition. During an examination, examiners assign a CAMEL rating, which completes the examination process."  OIG Report at 4.

St. Paul also engaged an outside auditor, George Hanks, to perform yearly audits during this time period.  (Raguz Depo. at Tr. 67-68, 71; Calevich Depo. at Tr. 64-65, 106-108.)  These reports were similarly provided to the St. Paul Board and Supervisory Committee.  (Raguz Depo. at Tr. 67-68, 71; Calevich Depo. at Tr. 106-108; Ritzler Depo. at Tr. 15, 24-25.)  It is undisputed that none of these audits revealed Mr. Raguz's fraud.  (Calevich Depo. at Tr. 120-121.)

Throughout the relevant time period, Defendant CUMIS was St. Paul's fidelity insurer.[9] Mr. Raguz testified that, from 2000 forward, he was the individual at St. Paul that completed the CUMIS applications for fidelity bond renewals.  (Raguz Depo. at Tr. 57-58.)  He acknowledged in deposition that he repeatedly lied when completing the CUMIS bond applications:

Q: Did you have CUMIS as your fidelity insurer?

A: The whole time, yeah.  The whole length of the credit union time, they had nobody else as their insurer.

Q: So 2000, you filled out the application?

A: Every year.

Q: 2001, 2002, 2003?

A: Yes.

Q: All the way through to the end?

A: Yes, sir.

\* \* \*

Q: And any questions about claims or anything like that, do you

---

[9]  As discussed *infra*, the fidelity bond issued by CUMIS to St. Paul provided coverage for, among other things,  "loss resulting directly from dishonest acts committed by an 'employee' or 'director,' acting alone or in collusion with others," and, for "loss resulting directly from a named 'employee's' 'failure to faithfully perform his/her trust.'"  (Doc. No. 90-2 at 20, 24-25.)

remember?

A:      At the very end, the big question was a question about fraud.  That's the last question on the application.

Q:      Do you remember the question?

A:      Something to the fact that you– testing that there was no fraud being made at the credit union.  That's the very last question on the application.[10]

Q:      And when you filled out the application, you knew that wasn't the case?

A:      Right.

Q:      So you lied on the application?

A:      I did, yes.

Q:      And you lied going all the way back on all the applications?

A:      I lied every year, yes, sir.

*Id*. at Tr. 58-59.  CUMIS contends (and Plaintiff does not challenge) that, as St. Paul's assets grew, its bond limit was incrementally increased from $2.5 million in 2002; to $3 million in 2003; to $3.5 million in 2004; to $4.0 million in 2006; and, finally, to $5.0 million in February 2010.  (Doc. No. 88-1 at 2.)

Sometime in early 2010, the NCUA began to have concerns regarding St. Paul's operations.[11]  The NCUA retained Lillie & Company, Inc. to conduct a forensic accounting.

---

[10]  Specifically, the CUMIS bond applications asked the following question:  "Does any director, officer, committee member, volunteer, employee or any entity(s) which would be covered under any bond or insurance policy have knowledge or information of any act, error, or omission which might give rise to a claim against any director, officer, committee member, volunteer, employee or any entity(s) which would be covered under any bond or insurance policy?"  (Doc. No. 88-2.)

[11]  The OIG Report states that:  "In January 2010, representatives from the Federal Bureau of Investigation (FBI) and the Internal Revenue Service (IRS) met with NCUA staff regarding

(Doc. No. 98-4.) The results of this investigation revealed St. Paul had incurred in excess of $72 million in damages due to employee dishonesty. (Doc. Nos. 98-4 at 5-7, 90-5 at 7-8.) On April 23, 2010, the NCUA Board placed St. Paul in conservatorship pursuant to 12 U.S.C. § 1786(h)(1). (Doc. No. 90-1.) One week later, on April 30, 2010, the NCUA Board placed St. Paul into involuntary liquidation due to insolvency and appointed itself the Liquidating Agent pursuant to 12 U.S.C. § 1787(a)(1)(A).[12] *Id.*

On April 12, 2010, St. Paul placed CUMIS on notice of "potentially impermissible" member business loans and "potential improper member accounts," and requested "written verification of continued coverage without change in terms of the bond policy." (Doc. No. 90-4.) On September 9, 2010, CUMIS sent a letter to the NCUA in which it purported to rescind the bond policy "based on material misrepresentations and concealment of material facts made at the time the credit union obtained and renewed the fidelity bond." (Doc. No. 90-6.) On October 8, 2010, the NCUA filed a Proof of Loss with CUMIS in the amount of $72,546,823.72. (Doc. No. 90-5.) CUMIS has continued to deny coverage.

On August 18, 2011, Plaintiff filed the instant action seeking a declaratory judgment that

---

NCUA's examination program and process. The Federal representatives were concerned that potential criminal activity was occurring at St. Paul. Consequently, NCUA started an in-depth examination and hired an independent certified public accounting firm to perform a fraud audit." OIG Report at 8.

[12] In March 2011, Mr. Raguz was indicted on one count of bank fraud in violation of 18 U.S.C. § 1344; four counts of money laundering in violation of 18 U.S.C. § 1957; and, one count of receipt of commissions or gifts for procuring loans in violation of 18 U.S.C. § 215(a)(2), in connection with his role in the failure of St. Paul Croatian Federal Credit Union. *See United States v. Raguz*, Case No. 1:11CR0008 (N.D. Ohio) (Doc. No. 17.). He pled guilty to all charges on September 27, 2011. *Id*. at Doc. No. 96, 100. On November 27, 2012, Raguz was sentenced to 168 months incarceration and ordered to pay $71,501,823.72 in restitution. *Id*. at Doc. No. 176.

CUMIS owes coverage under the fidelity bond it issued to St. Paul for losses arising from employee or director dishonesty.  (Doc. No. 1 at ¶¶ 8-19, 32-34.)  The parties timely filed cross motions for summary judgment on October 29, 2014.  (Doc. Nos. 88, 90.)  Briefs in Opposition were filed on December 5, 2014, and replies were filed on December 22, 2014.  (Doc. Nos. 97, 98, 99, 100.)

### III. <u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and states:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense  – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

In considering summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)(*citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact.  *Fulson v. City of Columbus*, 801 F.

Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.* "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 257.

In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007). When ruling on a motion for summary judgment, "a judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" *Anderson*, 477 U.S. at 252 (citations omitted); *accord Fuller v. Landmark 4 LLC*, 2012 WL 1941792 (N.D. Ohio May 29, 2012). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter ...." *Anderson*, 477 U.S. at 249. "It is an error for the district court to resolve credibility issues against the nonmovant." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008).

## IV.     Law and Analysis

In its Motion for Summary Judgment, Plaintiff argues the fidelity bond issued to St. Paul by CUMIS provides coverage for the losses stemming from Mr. Raguz's fraudulent conduct. It maintains CUMIS cannot rescind the bond based on Mr. Raguz's misrepresentations in the bond

renewal applications because the bond does not (1) clearly incorporate the applications; or, (2) state that any material misrepresentations will render the bond *void ab initio*.  Plaintiff further argues that coverage under the bond did not terminate because there is no evidence that any member of the St. Paul Board or Supervisory Committee, or any "supervisory staff" members at St. Paul, had knowledge of dishonest conduct on the part of Mr. Raguz.  Therefore, Plaintiff maintains it is entitled to summary judgment on its claim for a declaratory judgment that CUMIS owes coverage under bond.  (Doc. No. 90.)

CUMIS moves for summary judgment in its own favor on the basis of four arguments. First, CUMIS argues that, under Ohio law, it was entitled to rescind the fidelity bond at issue based on Mr. Raguz's material misrepresentations in the bond applications.  Second, CUMIS asserts coverage for Mr. Raguz terminated more than two years before Plaintiff's claim was made because at least one St. Paul "supervisory staff" member (Mirjana Zovkic) learned of the fraud by no later than April 2008.  Third, CUMIS maintains the claim is barred by the bond's two year contractual period of limitations because St. Paul's Board of Directors learned of facts which constitute discovery of the loss by no later than April 2008.  Finally, CUMIS argues Plaintiff cannot carry its burden of demonstrating that the loss at issue resulted directly from Mr. Raguz's dishonesty.  (Doc. No. 88.)

A.      **Ohio Law Regarding Construction of Insurance Contracts**

It is undisputed that Ohio law applies to the instant dispute.[13]  "Under Ohio law, an

_____

[13]  The Complaint alleges that "Cumis's bond is subject to and to be interpreted under the laws of the State of Ohio."  (Doc. No. 1 at ¶ 20.)  In its Answer, CUMIS states that these allegations "state legal conclusions which do not require a response. To the extent a response is required, these allegations are denied." (Doc. No. 3 at ¶ 20.)  The parties do not directly address this issue in their motions or related briefing.  Both parties, however, rely heavily on Ohio law throughout their briefs and do not argue that federal law or the law of a State other than Ohio

insurance policy is a contract and the interpretation and construction of insurance policies is

determined by rules of construction and interpretation applicable to contracts generally." *Guyan*

*International, Inc. v. Professional Benefits Administrators, Inc.*, 2013 WL 1338194 at * 15 (N.D.

Ohio March 29, 2013) (Dowd, J.)  *See also Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216,

218, 797 N.E.2d 1256 (2003) ("An insurance policy is a contract."); *St. Marys Foundry v.*

*Employers Ins. of Wausau,* 332 F.3d 989, 992 (6th Cir. 2003) ("In Ohio, normal rules of contract

construction apply to the interpretation of insurance policies."); *Chicago Title Ins. Co. v. The*

*Huntington National Bank*, 87 Ohio St.3d 270, 273, 719 N.E.2d 955 (1999).  In interpreting an

insurance contract, the court is to give effect to the intent of the parties to the agreement.

*Westfield*, 100 Ohio St.3d at 219.  As explained by the Ohio Supreme Court:

> We examine the insurance contract as a whole and presume that the intent of the
> parties is reflected in the language used in the policy.  *Kelly v. Med. Life Ins. Co.*
> (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the
> syllabus.  We look to the plain and ordinary meaning of the language used in the
> policy unless another meaning is clearly apparent from the contents of the policy.
> *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403,
> 374 N.E.2d 146, paragraph two of the syllabus.  When the language of a written
> contract is clear, a court may look no further than the writing itself to find the
> intent of the parties.  *Id.*  As a matter of law, a contract is unambiguous if it can be
> given a definite legal meaning.  *Gulf Ins. Co. v. Burns Motors, Inc.* (Tex. 2000),
> 22 S.W.3d 417, 423.
>
> [11] [12]  {¶ 12} On the other hand, where a contract is ambiguous, a court may
> consider extrinsic evidence to ascertain the parties' intent.  *Shifrin v. Forest City*
> *Enterprises, Inc.* (1992), 64 Ohio St.3d 635, 597 N.E.2d 499.  A court, however,
> is not permitted to alter a lawful contract by imputing an intent contrary to that
> expressed by the parties.  *Id.; Blosser v. Enderlin* (1925), 113 Ohio St. 121, 148
> N.E. 393, paragraph one of the syllabus ("there can be no intendment or
> implication inconsistent with the express terms [of a written contract]").

*Id.  See also Safeco Ins. Co. of Am. v. White*, 122 Ohio St.3d 562, 566-567, 913 N.E.2d 426

---

applies.  Nor do either of the parties direct this Court's attention to a choice of law provision in
the fidelity bond that suggests the law of a different State should apply.

(2009) (stating that "our task is to 'examine the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy'") (quoting *Westfield*, *supra*); *Werner v. Progressive Preferred Ins*., 533 F.Supp.2d 776, 781 (N.D. Ohio 2008) ("The Court must reasonably interpret an insurance contract in conformity with the parties's intentions as gathered from the ordinary and commonly understood meaning of the language employed.")(internal quotations omitted)(quoting *Brooks v. All America Ins. Co.,* 2002 WL 31718868 at *2 (Ohio App. 3rd Dist. Dec. 5, 2002)); *Guyan*, 2013 WL 1338194 at * 15.

Thus, in interpreting policy provisions, "Ohio courts first determine whether contract terms are ambiguous." *St. Marys Foundry*, 332 F.3d at 992.  "The mere absence of a definition in an insurance contract does not make the meaning of the term ambiguous." *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 109, 652 N.E.2d 684 (1995).  Rather, a term is considered ambiguous only "if it is reasonably susceptible of more than one meaning." *St. Mary's Foundry,* 332 F.3d at 992 (citing *Weiss v. St. Paul Fire & Marine Ins. Co.*, 283 F.3d 790, 796 (6th Cir. 2002)(citing *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 519 N.E.2d 1380, 1383 (1988)).  *See also Lager v. Miller-Gonzalez,* 120 Ohio St.3d 47, 49-50, 896 N.E.2d 666 (2008) ("Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation.")  If the terms of a policy are ambiguous, those terms will ordinarily be strictly construed against the insurer and in favor of the insured.[14]  *See e.g., Guyan*, 2013 WL

---

[14] Citing cases from the First, Fifth, Seventh and Eighth Circuits and state court cases from Wisconsin and Illinois, CUMIS argues this principle (i.e., that ambiguous terms in an insurance policy should be strictly construed against the insurer) does not apply in the context of fidelity bonds.  (Doc. No. 100 at 15-16.)  CUMIS does not cite any cases indicating that *Ohio* courts do not apply this principle of contract construction in the context of fidelity bonds. To the contrary, this Court has found several cases in which this principle has been cited in the interpretation of fidelity bonds under Ohio law.  *See e.g., First Defiance Financial Corp.v. Progressive Casualty Ins. Co.*, 688 F.Supp.2d 703, 706 (N.D. Ohio 2010) (Zouhary, J.) (in

1338194 at * 15; *Honeybaked Foods, Inc. v. Affiliated FM Ins. Co.*, 757 F.Supp.2d 738, 745 (N.D. Ohio 2010); *King*, 35 Ohio St.3d at 211.

Nonetheless, the Ohio Supreme Court has cautioned that, "[a]lthough ambiguous provisions in an insurance policy must be construed strictly against the insurer and liberally in favor of the insured . . . . , it is equally well settled that a court cannot create ambiguity in a contract where there is none." *Lager*, 120 Ohio St.3d at 49 (citing *Hacker v. Dickman*, 75 Ohio St.3d 118, 119, 661 N.E.2d 1005 (1996)). If the terms of an insurance policy are not ambiguous, the court determines the meaning of the policy. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 652 N.E.2d 684, 686 (1995).

### B.    Rescission

The fidelity bond issued by CUMIS to St. Paul provides coverage for "employee or director dishonesty" and "failure to faithfully perform." (Doc. No. 90-2 at 20, 24.) Specifically, the bond provides that "[w]e will pay you for your loss resulting directly from dishonest acts committed by an 'employee' or 'director,' acting alone or in collusion with other." (Doc. No. 90-2 at 20.) It further provides that "[w]e will pay you for your loss resulting

---

context of construing fidelity bond under Ohio law, stating that "[i]f contract provisions allow for more than one reasonable interpretation, the provisions must be strictly construed against the insurer"); *First National Bank of Dillonvale v. Progressive Casualty Ins.*, 94 Ohio App.3d 368, 373 (Ohio App. 7th Dist. 1993)("Since the [financial institution] bond [covering employee dishonesty] . . . was an insurance policy, Ohio law requires that ambiguous terms are to be construed liberally in favor of the insured") *abrogated on other grounds by Bush v. W.C. Cardinal Co.*, 2003 WL 22332938 (Ohio App. 7th Dist. 2003). *See also Zeller v. Auto Owners Insurance Co.,* 2014 WL 5803028 at * 4 (Ohio App. 3rd Dist. Nov. 10, 2014) (in the context of Tailored Protection Policy that covered employee dishonesty, finding that "any ambiguity is construed against the insurer"); *Guyan*, 2013 WL 1338194 at * 18 (applying this principle in context of policy issued to employee benefits plan administrator that included Crime Coverage Section for employee theft.)

16

directly from a named 'employee's' 'failure to faithfully perform his/her trust.'"[15]  (Doc. No. 9-2 at 24.)   At the outset, the bond states as follows:

> This Fidelity Bond applies to covered loss discovered by you while this Bond is in effect.  Some provisions restrict coverage.  Do not rely on the title or captions used in this Bond.  Read this entire Bond carefully to determine your rights, duties, and what is or is not covered.

> Throughout this Bond the words you and your refer to the Insured shown on the Declarations.  The words we, us and our refer to CUMIS Insurance Society, Inc.

> Words and phrases appearing in quotation marks in this Bond are defined under the Definitions section of this Bond. **All coverages in this Bond are subject to the Declarations, Definitions, Exclusions, General Agreements and Conditions, except as modified in any endorsement.**

> Coverages set forth below are only afforded to you if, and to the extent that, coverage is indicated on the Declarations.

(Doc. No. 90-2 at 20) (emphasis added).

In the General Agreements section, the bond provides that:

**1.       Your Warranty**

**A statement made by or on behalf of you, whether contained in the application or otherwise, is a warranty that the statement is true to the best of the knowledge and belief of the person making the statement.**

(Doc. No. 90-2 at 63) (emphasis added.)

The applications for the fidelity bond renewals posed the following questions:

1.  Does any director, officer, committee member, volunteer, employee or any entity(s) which would be covered under any bond or insurance policy have

---

[15]  The bond defines "failure to faithfully perform his/her trust" as "acting in conscious disregard of your established and enforced share, deposit or lending policies." (Doc. No. 90-2 at 42.)  It also states that this term does not mean (1) negligence, mistakes or oversight; (2) acts or omissions resulting from inadequate training; (3) unintentional violation of laws or regulations; (4) unintentional violation of your policies or procedures; (4) acts or omissions known to, acquiesced in, or ratified by your Board of Directors; or (5) acts of an "employee" for which you could have made claim under Employee or Director Dishonesty Coverage. *Id.*

knowledge or information of any act, error, or omission which might give rise to a claim against any director, officer, committee member, volunteer, employee or any entity(s) which would be covered under any bond or insurance policy?

2.  Does any director, officer, committee member, volunteer, employee or any entity(s) which would be covered under any bond or insurance policy have knowledge or information of any claims, demands or lawsuits currently pending or threatened that may be or have already been brought against any director, officer, committee member, volunteer, employee or any entity(s) which would be covered under any bond or insurance policy?

3.  Has any regulatory agency or insurer informed any director, officer, committee member, volunteer, employee or any entity(s) which would be covered under any bond or insurance policy orally or in writing of any actual or potential claims situations or lawsuits or of any act, error or omission which might give rise to a claim against any director, officer, committee member, volunteer, employee or any entity(s) which would be covered under any bond or insurance policy?

(Doc. No. 88-2.)  The applications further provided that: **"It is agreed that if such knowledge or information exists, any claim or action subsequently arising therefrom shall be excluded from coverage.**"  *Id.* (emphasis added.)  As noted *supra*, Mr. Raguz completed the bond renewal applications during the relevant time period and admitted during deposition that he lied on every application when answering the above questions.  (Raguz Depo. at Tr. 57-59.)

Relying heavily on the Ohio Supreme Court's decision in *Allstate Insurance Company v. Boggs*, 27 Ohio St.2d 216 (1971), Plaintiff argues CUMIS is not entitled to rescission because the fidelity bond does not (1) clearly incorporate the applications; or, (2) state that any material misrepresentations will render the bond *void ab initio*.  In *Boggs,* Inland Mutual Insurance Company ("Inland") issued an automobile policy to Dallas Christopher ("Christopher").  In applying for this policy, Christopher misrepresented both his age and his history of traffic accidents/violations.  Christopher was subsequently involved in a fatal traffic accident, in which

both he and Williams Boggs were killed. Inland thereafter discovered Christopher's misrepresentations. It maintained it would not have issued the policy had it known Christopher's correct age (i.e., under 25), and refused coverage on the ground that its policy was void *ab initio*.

The trial court rejected Inland's argument, and found the policy was in full force and effect at the time of the accident. The state appellate court affirmed. On appeal, the primary question before the Ohio Supreme Court was "whether a misstatement of age by an insured in an application for an automobile liability insurance policy renders the policy void *ab initio*." *Id*. at 218. In resolving this issue, the court explained as follows:

> Statements by an insured fall into two classes-those which constitute warranties, and those which constitute representations.
>
> [1] The consequences of a misstatement of fact by an insured are entirely different, depending on whether the statement is a warranty or a representation. If the statement is a warranty, a misstatement of fact voids the policy *ab initio*. However, if the statement is a representation, a misstatement by the insured will render the policy voidable, if it is fraudulently made and the fact is material to the risk, but it does not void the policy *ab initio*.
>
> [2] In the law of insurance, a representation is a statement made prior to the issuance of the policy which tends to cause the insurer to assume the risk. A warranty is a statement, description or undertaking by the insured of a material fact either appearing on the face of the policy or in another instrument specifically incorporated in the policy. *Hartford Protection Ins. Co. v. Harmer* (1853), 2 Ohio St. 452. *See* 30 Ohio Jurisprudence 2d 415, Section 460.
>
> [3] The insurer's decision to incorporate the statement in or to omit it from the policy generally controls whether the statement is a warranty or a representation.
>
> [4] [5] [6] However, the mere fact that a statement of an insured is incorporated in a policy does not necessarily make such statement a warranty. Courts do not favor warranties, or forfeitures from the breach thereof, and a statement as to conditions does not constitute a warranty unless the language of the policy, construed strictly against the insurer, requires such an interpretation. The fundamental principle is that inasmuch as policies of insurance are in the language selected by the insurer they are to be construed strictly against the insurer, and liberally in favor of the insured. *Butche v. Ohio Cas. Ins. Co.* (1962),

174 Ohio St. 144, 187 N.E.2d 20.  *See* 30 Ohio Jurisprudence 2d 225 and 227, Sections 215 and 216.

[7]  In other words, an insurer is bound by the provisions which he chooses to incorporate in his policy.  If it is his purpose to provide that a misstatement by the insured shall render the policy void *ab initio*, such facts must appear clearly and unambiguously from the terms of the policy.

*Id*. at 218-219.

Examining the policy and application at issue, the court first observed that "there is no provision in the policy to the effect that any misstatement or misrepresentation made by the insured shall render the policy void."  *Id*. at 219.  Thus, the court considered "whether the insurer in its contract of insurance provided that age was such a material fact that a misrepresentation thereof would make the contract void *ab initio*."  *Id.* at 219-220.  Although the application required that Christopher state his age and the policy provided generally that "the named insured agrees that the statements in . . . the application for this policy are his agreements and representations, and that this policy is issued in reliance upon the truth of such representations," the court found that the application was not incorporated into the policy.  *Id.* at 220.  It noted that "the mere fact that a policy of insurance refers to the application does not make such application a part of the policy."  *Id.*  Rather, "[i]n order to have an incorporation by reference in an insurance policy, it must be done in unequivocal language on the face of the policy."  *Id.*

Therefore, the court looked to the policy itself to determine whether Christopher's misstatements regarding his age were sufficient to render the policy void *ab initio*.  *Id.*  Because no reference was made in the policy to the age of the insured, the court determined that "the insurer failed to incorporate [Christopher's] statement as to age."  *Id.*  Thus, "[t]hat representation in the application, if shown to be material to the risk and fraudulently made,

would be grounds for cancellation of the policy, but does not render the policy void *ab initio*, and may not be used to avoid liability after the accident has occurred." *Id.* at 221. Rather, "[i]n order for an insurer to successfully assert that an insured's misstatement as to his age in an insurance policy application is a strict warranty which makes the policy void *ab initio*, the insurer must include a statement in the policy which it issues to the effect that such a representation as to age in the application is a warranty."[16] *Id.*

Ohio courts interpreting *Boggs* have found that it established a two-pronged test for determining whether a misstatement qualifies as a warranty or a representation. The first prong requires that the statement "plainly appear on the policy . . . or be plainly incorporated into the policy." *Am. Family Ins. Co. v. Johnson*, 2010 WL 1712240 at * 3 (Ohio App. 8th Dist. 2010). *See also Goodman v. MedMarc Insurance*, 2012 Ohio 4061, 977 N.E.2d 128, 132 (Ohio App. 8th Dist. 2012); *The Unencumbered Assets, Trust v. Great American Insurance Co., et al.*, 817 F.Supp.2d 1014, 1026 (S.D. Ohio 2011); *Personal Service Insurance Company v. Lester,* 2006 WL 2796253 at * 4 (Ohio App. 4th Dist. Sept. 25, 2006); *State Farm Fire & Casualty Company v. Davidson*, 87 Ohio App.3d 101, 106, 621 N.E.2d 887 (Ohio App. 2nd Dist. 1993). Under the second prong, the terms of the policy must "clearly and unambiguously" "provide that a misstatement by the insured shall render the policy void *ab initio*." *Great American Insurance Co.*, 817 F.Supp.2d at 1026 (quoting *Boggs*, 27 Ohio St.2d at 219). *See also Horton v. Safe Auto*

---

[16] Ohio courts have explained the distinction between a policy that is voidable and a policy that is void *ab initio*. If a policy is merely voidable, then an insurer may be liable for any claims arising before the policy is voided. *See State Farm Fire & Cas. Co. v. Davidson*, 87 Ohio App.3d 101, 621 N.E.2d 887 (Ohio App. 2nd Dist. 1993). If a policy is declared void *ab initio*, it is considered to never have been executed and, therefore, an insurer has no obligation under the policy. *Id. See also Medical Protective Company v. Fragatos*, 190 Ohio App. 3d 114, 121, 940 N.E.2d 1011 (Ohio App. 8th Dist. 2010).

*Insurance Company*, 2001 WL 664421 at * 3 (Ohio App. 10th Dist. June 14, 2001) (stating that

the second part of the *Boggs* test requires "a plain warning that a misstatement as to the warranty

will render the policy void from its inception"); *Davidson*, 87 Ohio App.3d at 106 (same);

*Lester*, 2006 WL 2796253 at * 4 (same).

Plaintiff maintains the first prong of the *Boggs* test is not met because Mr. Raguz's

statements do not appear on the face of the bond and, further, because the bond does not

expressly incorporate Mr. Raguz's misstatements in the bond application.  Plaintiff further

maintains the second prong of *Boggs* is also not satisfied because the plain language of the bond

does not provide that a misstatement shall render it void *ab initio*.  Rather, Plaintiff insists the

Bond "provides no warning of any consequence for making a misstatement."  (Doc. No. 99 at 5.)

Thus, Plaintiff maintains CUMIS is not entitled to rescind the bond as a matter of law.

CUMIS maintains *Boggs* is distinguishable because it "dealt with the insured's

misrepresentations and its interplay with coverage for damages to third parties," whereas, here,

"plaintiff wants to ignore the insured's misrepresentations concerning the fraud so that it can

collect on the bond limits procured by fraud."  (Doc. No. 88-1 at 6.)  CUMIS cites *Credit

General Insurance Company v. Marine Midland Bank*, 1992 WL 1258518 (S.D. Ohio Aug. 24,

1992) in support of this argument.  In *Credit General*, Marine Midland Bank obtained a

reinsurance Vehicle Single Interest ("VSI") policy from Credit General Insurance Co. for certain

automobile loans written by Marine Midland.  Under this policy, Marine Midland submitted

claims to Credit General relating to "repurchase loans," which were associated with a higher

degree of risk.[17]  Credit General paid these claims for several years apparently without realizing

---

[17] As explained in the decision, "VSI insurance protects a bank against the risk of
uninsured physical loss or damage to the automobile collateral because the borrower had failed

they were associated with repurchase loans.  Once it discovered this fact, Credit General filed

suit alleging "Marine Midland had intentionally and negligently concealed and misrepresented

the fact that it was purchasing repurchase paper from New England [car] dealers and the risks

associated with such financing, thus increasing the risks to Credit General."  *Id*. at *4.

     Marine Midland moved for summary judgment on Credit General's claim, relying on

*Boggs* for the proposition that (even if it had failed to disclose the repurchase loans), the VSI

policies at issue were voidable and not void *ab initio* and, therefore, Credit General was

responsible for all claims submitted before the policy was cancelled.  The court rejected this

argument as follows:

> The Court does not agree with Marine Midland that the Ohio Supreme Court's decision in *Boggs* means that Credit General is necessarily liable for all claims occurring before the policy was cancelled.  *Boggs* is distinguishable. Therein, the court dealt with the potential liability of an insurance company to third parties injured by the company's insured.  **The *Boggs* court did not suggest that the insured could not be liable to the *insurer* for damages caused by his misrepresentation.  Herein, the question is whether an insured can be liable to a reinsurance company for allegedly misrepresenting and concealing information material to the risk of the reinsurance company.  This Court is not willing to extend *Boggs* to a situation such as the present one where it is**
>
> to obtain or to maintain insurance on the automobile collateral. The insured (lender) can make a claim under a VSI policy when a borrower defaults on a car loan and the car, when repossessed by the lender, is in a damaged condition and the borrower does not have other insurance to repair the damage. Generally, two types of car loans can be covered by VSI policies: 1) direct loans whereby a financial institution such as Marine Midland directly lends money to the purchaser of an automobile and 2) indirect loans which originate with an automobile dealer and are later assigned to the financial institution. There are, in turn, two types of indirect loans, non-recourse and recourse or repurchase. * * * The focus of this case is upon the second type of indirect loans, repurchase loans. [footnote omitted].  Under a repurchase loan, if the purchaser of an automobile defaults on his or her loan, the financial institution has recourse against the automobile dealer and can require the automobile dealer to repurchase the automobile for the outstanding loan balance.  In this case, the focus is on 90 day repurchase loans, under which Marine Midland could require the dealer to repurchase a vehicle at any time within 90 days of its repossession."  *Id*. at * 1.

**alleged that the insured fraudulently concealed material risks from its insurer.**  Accordingly, the Court concludes that *Boggs* does not prevent Marine Midland from being held legally responsible for claims which occurred before the policy was cancelled.

*Id*. at * 8 (italics in original; bold added).

CUMIS suggests the above language stands for the proposition that *Boggs* applies only in the context of third party claims and not when an insured seeks a declaration of coverage where the insured itself allegedly misrepresented material facts in procuring the policy.  As an initial matter, the Court disagrees with CUMIS' reading of *Credit General*.  In that case, the insurance company sued the insured, seeking damages for the insured's alleged fraudulent concealment in procuring the policy at issue.  The court found *Boggs* did not address the particular issue presented by Credit General's claim; i.e., "whether an insured can be liable to a reinsurance company for allegedly misrepresenting and concealing information material to the risk of the reinsurance company."  *Id*.  Here, of course, CUMIS is not seeking damages from Plaintiff for claims paid as a result of Mr. Raguz's fraudulent concealment.  Rather, CUMIS seeks to rescind the bond and Plaintiff seeks a declaration of its right to coverage thereunder.  This is precisely the context in which *Boggs* has been routinely applied by Ohio courts and renders the instant case distinguishable from *Credit General*.

Moreover, even if CUMIS were correct that *Credit General* stood for the proposition that *Boggs* does not apply to first party claims, the Court would decline to adopt that position.  In the over twenty years since *Credit General* was decided, Ohio courts have applied *Boggs* to first party claims on numerous occasions.  *See e.g. Goodman v. Medmarc Insurance*, 2012 Ohio 4061, 977 N.E.2d 128 (Ohio App. 8th Dist. 2012) (applying *Boggs* where insured sought declaratory judgment that his professional liability insurer was obligated to provide coverage

despite the fact insured allegedly misrepresented in insurance application that he was unaware of any possible malpractice claims); *James v. Safeco Insurance Co.*,195 Ohio App. 3d 265, 959 N.E.2d 599 (Ohio App. 8th Dist. 2011) (applying *Boggs* where insured alleged that insurance company wrongfully denied coverage under auto policy due to insured's misstatements regarding identity and residency of driver); *American Family Insurance Co. v. Johnson*, 2010 WL 1712240 (Ohio App. 8th Dist. April 29, 2010) (applying *Boggs* where insurance company sought declaration that homeowner's policy was void *ab initio* because of insureds' failure to disclose previous house fire); *Horton v. Safe Auto Insurance Company,* 2001 WL 664421 (Ohio App. 10th Dist. June 14, 2001) (applying *Boggs* where insured alleged that insurance company wrongfully denied coverage under auto policy where insured misrepresented residency of driver); *McGuire v. Erie Insurance Exchange*, 1992 WL 518771 (Ohio App. 5th Dist. Dec. 11, 1992) (applying *Boggs* where insured alleged that insurance company wrongfully declared commercial premises policy void and denied coverage due to insured's misstatements regarding prior theft loss and previous denials of coverage).  Accordingly, the Court rejects CUMIS' argument that *Boggs* is distinguishable on this basis.

CUMIS goes on to assert, however, that *Boggs* is not applicable because that case dealt with a misstatement concerning age in the context of an automobile insurance policy, while fidelity bonds are a very different form of insurance.  (Doc. No. 88-1. at 6, fn 2.)  The Court disagrees.  While *Boggs* itself happened to involve an automobile policy, Ohio courts have not limited its application solely to cases involving auto policies.  To the contrary, *Boggs* has been applied in a myriad of contexts, including homeowner's policies, professional liability policies, and commercial premises policies.  *See e.g. American Family Insurance Co. v. Johnson*, 2010

25

WL 1712240 (Ohio App. 8th Dist. April 29, 2010) (homeowner's policy); *Goodman v. Medmarc Insurance*, 977 N.E.2d 128 (Ohio App. 8th Dist. 2012) (professional liability policy); *Medical Protective Company v. Fragatos*, 190 Ohio App.3d 114, 940 N.E.2d 1011 (Ohio App. 8th Dist. 2010) (medical malpractice policy); *CARE Risk Retention Group v. Martin*, 191 Ohio App.3d 797, 947 N.E.2d 1214 (Ohio App. 2nd Dist. Dec. 10, 2010) (medical malpractice policy); *McGuire v. Erie Insurance Exchange*, 1992 WL 518771 (Ohio App. 5th Dist. Dec. 11, 1992) (commercial premises policy).

Moreover, *Boggs* was recently applied by a district court from the Southern District of Ohio in the context of a Director & Officer's ("D&O") policy, which provided coverage for both a financial entity and its directors and officers for claims made against them based on "wrongful acts." *See The Unencumbered Assets, Trust v. Great American Insurance Co.*, 817 F.Supp.2d 1014 (S.D. Ohio 2011). In that case, National Century Financial Enterprises procured an excess D&O policy from Great American Insurance Company. This policy provided coverage for "wrongful acts," which was defined as "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted, or allegedly committed or attempted, by one or more Director or Officer." *Id.* at 1020. National Century's business was to purchase accounts receivables at a discount from health care providers. Lance Poulson was one of the original founders of National Century and served as its president, chairman, and director. Mr. Poulson (along with several other directors and officers of National Century) "used their power over National Century and its supposedly independent subsidiaries to defraud investors." *Id.* at 1019. Indeed, the district court observed that "[i]t is undisputed that Poulson [and several other directors] used their authority at National Century to commit a multi-billion dollar fraud."

26

*Id.* at 1020.  Based on their roles in the fraud, Poulson and several other directors were convicted in federal criminal proceedings of (among other things) securities fraud and wire fraud.  *Id*. at 1022.

Plaintiff and several of National Century's principal executives (including Poulson) claimed they were entitled to coverage under the D&O policy.[18]  Great American counterclaimed and moved for summary judgment, arguing it was entitled to rescind the policy as void *ab initio* on the basis of Poulson's false representations in the policy proposal form.  *Id*. at 1025.  The district court applied the two-pronged test in *Boggs* to determine whether Poulson's statements were warranties or representations.  After carefully examining the language of the policy,[19] the court determined Poulson's statements were warranties because the policy specifically incorporated the proposal form which in turn specifically incorporated fraudulent financial statements, all of which were completed by Poulson.  The court further found the policy satisfied the second prong of the *Boggs* test because it clearly and unambiguously provided that any

---

[18] National Century filed for Chapter 11 bankruptcy in 2002.  The debtors originally filed the action as an adversary proceeding seeking a declaration that the D&O policies were enforceable and requesting an equitable procedure for apportioning the proceeds among the insureds.  The Unencumbered Assets, Trust ("UAT") was created in bankruptcy court to pursue legal causes of action belonging to debtor National Century and its subsidiaries.  It was later substituted as the plaintiff when the bankruptcy court's liquidation plan authorized the UAT to pursue certain legal causes of action belonging to the debtors.  Great American asserted counterclaims in that action for rescission of the policy and a declaratory judgment that the policy was void for fraud.  It later moved to withdraw the reference of the policy dispute, which was granted by the district court in 2005.  As part of this action, National Century's principal executives, including Poulson, sought payment of defense costs under the D&O policy.

[19]  The policy's declaration page provided that: "These Declarations, along with the endorsements (if any) and the completed and signed Proposal Form, shall constitute the contract between the Insured and Insurer."  *Id*. at 1027.  Further, Great American's excess D&O policy adopted the exact terms of the primary D&O policy issued by Gulf Insurance, which provides that "In the event that any statement or representation is untrue, this Policy shall be void and of no effect whatsoever."  *Id.* at 1028.

misstatement rendered the policy "void and of no effect whatsoever."[20]  *Id*.

While *Great American* did not involve a fidelity bond, the D&O policy at issue in that case is similar to the fidelity bond in many respects.  As noted above, *Boggs* was applied in that case to determine whether the insurance company could rescind the policy as void *ab initio*.  Moreover, while CUMIS cites decisions from other Circuits that comment on some of the differences between fidelity bonds and other types of insurance policies, CUMIS cites no legal authority suggesting that the concepts set forth in *Boggs* regarding rescission would not apply in the context of coverage disputes involving fidelity bonds.[21]  Accordingly, the Court rejects CUMIS' argument that *Boggs* is not relevant to determining whether CUMIS is entitled to

---

[20] The court, however, went on to find there was a genuine issue of material fact whether Great American waived its right to rescission by accepting payment for tail coverage.  *Id*. at 1031.  Therefore, it denied Great American's motion for summary judgment on the grounds that the policy is void *ab initio*.  *Id.* at 1032.  The court also determined that Poulson and the other principals were excluded from coverage under the policy's dishonesty exclusion for criminal conduct.

[21] None of the cases cited by CUMIS are relevant to whether Ohio courts would treat fidelity bonds differently with respect to the issue of rescission.  *FDIC v. Insurance Company of North America,* 105 F.3d 778 (1st Cir. 1997) examined whether Massachusetts courts would apply that state's "notice prejudice" rule to notice of loss provisions in a financial institution bond.  Interestingly, while remarking on some unique characteristics of fidelity bonds, that court nonetheless acknowledged that "'[i]n most cases and for most purposes, . . . [fidelity bonds] are recognized to be a form of insurance that are subject to the rules applicable to insurance contracts generally.'" *Id.* at 785 (quoting 1 *Couch on Insurance* 3d, § 1.16 (1995)).  The other case relied upon by CUMIS, *National Union Fire Insurance Company of Pittsburgh, Pa. v. FDIC*, 264 Kan. 733, 957 P.2d 357 (Kan. 1998), also did not involve rescission and instead analyzed Kansas law to determine whether the "notice prejudice" rule applied to proof of loss provisions in fidelity bonds.  In that case, the Supreme Court of Kansas determined the rule did apply to fidelity bonds, noting that "currently there is no legally significant distinction drawn between an insurance contract and a fidelity bond." *Id.* at 360.  Finally, *Resolution Trust Corporation v. Moskowitz*, 868 F.Supp. 634 (D. N.J. 1994) considered whether a fidelity bond constituted a "discovery" policy or a "claims made" policy under New Jersey law, finding it to be the former and that the appreciable prejudice rule applied to proof of loss provisions in the bond.

rescind the bond issued to St. Paul as void *ab initio*.

Finally, CUMIS argues *Boggs* is distinguishable because the misstatements in that case were "tangential to the ultimate issue concerning coverage (i.e., the age was not what caused the damages that were insured)." (Doc. No. 88-1 at 6, fn 2.) CUMIS maintains that, unlike *Boggs*, the "misstatements which form the basis for CUMIS' rescission of the policy concern the very subject that forms the basis for the plaintiff's claim of coverage." *Id.* The Court rejects this argument. CUMIS cites no authority for its argument that *Boggs* is distinguishable on this basis. Moreover, and as discussed above, at least one court has applied *Boggs* in this very context. Indeed, in *Great American*, *Boggs* was applied where the misstatements of the insured (i.e., the fraudulent financial statements submitted by Poulson) formed both the basis for Great American's attempt to rescind the policy as well as the basis for the claim of coverage under the policy (i.e., "wrongful acts" of a director or officer). Accordingly, the Court finds this argument to be without merit.

Nevertheless, CUMIS argues that, even if *Boggs* is applicable, that case "actually supports CUMIS's position despite plaintiff's attempts to find inconsequential distinctions." (Doc. No. 97 at 3.) CUMIS maintains the "Your Warranty" provision of the bond does, in fact, expressly incorporate Mr. Raguz's misstatements in the application, satisfying the first prong of the *Boggs* test. Moreover, CUMIS asserts the second prong of the *Boggs* test is met because the application plainly warns that there will be no coverage in the event of a material misrepresentation. Because the bond "provided a clear warning that the misrepresentations would bar coverage," CUMIS is entitled to rescind the bond as a matter of law.

The Court disagrees. As noted *supra*, Mr. Raguz testified in deposition that he lied in the

29

bond renewal applications when he answered that he had no "knowledge or information of any act, error or omission which might give rise to a claim against any director, officer, committee member, volunteer, employee or any entity(s) which would be covered under any bond or insurance policy." (Raguz Depo. at Tr. 57-59.) In order for the first prong of the *Boggs* test to be satisfied, Mr. Raguz's misstatements in the bond application must be "plainly incorporated into the policy." *Johnso*n, 2010 WL 1712240 at * 3.

CUMIS argues this prong is satisfied by the "Your Warranty" provision of the policy, which states that: "[a] statement made by or on behalf of you, whether contained in the application or otherwise, is a warranty that the statement is true to the best of the knowledge and belief of the person making the statement." (Doc. No. 90-2 at 63.) The Court finds this language is not sufficient to incorporate the bond applications completed by Mr. Raguz into the policy. As noted in *Boggs*, "the mere fact that a policy of insurance refers to the application does not make such application a part of the policy." *Boggs*, 27 Ohio St.2d at 220. Rather, "[i]n order to have an incorporation by reference in an insurance policy, it must be done in unequivocal language on the face of the policy." *Id*. *See also Winston v. Illinois National Insurance Co.*, 2001 WL 395154 at *2 (Ohio App. 1ˢᵗ Dist. April 20, 2001) ("For an insurance application to be incorporated into the policy, the incorporating language must be unambiguous and must appear on the face of the policy.")

While the CUMIS bond references the application in the "Your Warranty" provision, the bond does not contain "unequivocal language" incorporating that application into the bond itself. It does not unambiguously provide that the application is incorporated into or made part of the bond, but simply attests that any statements in the application are true. This is not sufficient. As

30

the *Boggs* court observed, "[a]lthough the policy provides generally that, 'the named insured agrees that the statements in the declarations and in the application for this policy are his agreements and representations, that this policy is issued in reliance upon the truth of such representations,' nowhere is the application, as such, incorporated in and made a part of the policy."  *Boggs,* 27 Ohio St. at 220.  Likewise, the Court finds the "Your Warranty" language in the CUMIS bond does not clearly and unequivocally incorporate the application.

This conclusion is supported by a comparison of policy language that Ohio courts have deemed sufficient versus insufficient to satisfy the first prong of *Boggs*.  In *Johnson*, *supra*, the court found the following policy language did not expressly incorporate the application and, thus, failed to satisfy the first prong of *Boggs*: "We will provide this insurance to you in reliance on the statements you have given us in your application of insurance.  You warrant the statements in your application to be true and this policy is conditioned upon the truth of your statements."  *Johnson*, 2010 1712240 at * 4.  Similarly, in *James, supra*, the court found the following policy language insufficient to incorporate the application: "This policy was issued in reliance upon the information provided on your application. We may void this policy if you or an insured have concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, at the time the application was made or any time during the policy period." *James*, 195 Ohio App.3d at 268-269.  Finally, in *Chicago Insurance Company v. Capwill*, 2009 WL 3063351 at * 5 (N.D. Ohio Sept. 21, 2009) (Katz, J.), another judge in this District found that the following policy language was not sufficient to incorporate the application: "By acceptance of this policy, the insured agrees that the statements, Declarations, and application are his agreements and representations, that they shall be deemed material and that this policy is

issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the Company or any of its agents relating to this insurance."

Conversely, in *Fragatos, supra*, the court found that the following policy language expressly incorporated the application: "It is understood and agreed that the statements made in the insurance application are incorporated into, and shall be part of, this policy." *Fragatos*, 190 Ohio App.3d at 121-122.  Likewise, in *Unencumbered Assets, supra*, the following language in the policy declarations page was found sufficient to incorporate the proposal form containing the misstatements at issue: "These Declarations, along with the endorsements (if any) and the completed and signed Proposal Form shall constitute the contract between the Insured and Insurer."  *Unencumbered Assets*, 817 F.Supp.2d at 1027.  In *Winston*, *supra,* the policy provided that it was issued  "in reliance upon the statements made in the applications and declarations attached hereto and made part hereof," and the application provided that "it is agreed that this application shall be the basis of the contract should a policy be issued, and it will be attached to and become a part of the policy."  *Winston,* 2001 WL 395154 at * 3.  The court found that this language unambiguously incorporated the applications into the policy.  *Id.*  Lastly, in *Ozbay v. Progressive Insurance*, 2003 WL 257448 at *7 (Ohio App. 6th Dist. Feb. 7, 2003), the following policy language was found sufficient to satisfy *Boggs*: "If you pay your premiums when due, we agree to insure you, based upon the warranties and representations made by you in your application, subject to all of the terms of the Policy including all applicable endorsements attached to this Policy and shown in the Declarations.  The Declarations and your application are part of this Policy."

32

The "Your Warranty" provision in the CUMIS bond does not contain the type of unequivocal incorporation language set forth in *Fragatos, Unencumbered Assets, Winston*, and *Ozbay, supra*. Rather, the bond merely references the application, using language similar to that found insufficient by a number of Ohio courts as set forth above, including the Ohio Supreme Court in *Boggs* itself. Accordingly, the Court finds the CUMIS bond issued to St. Paul fails to unequivocally incorporate the misstatements set forth in the applications completed by Mr. Raguz and, therefore, the first prong of the *Boggs* test has not been satisfied.

Moreover, CUMIS does not point to any language in the bond that clearly and unambiguously provides that a misstatement by the insured shall render the policy void *ab initio*. CUMIS emphasizes language in the *applications* providing that "if such knowledge or information [of fraud] exists, any claim or action subsequently arising therefrom shall be excluded from coverage." (Doc. No. 88-2.) As an initial matter, the Court is not convinced that this language is sufficient to clearly and unambiguously provide that Mr. Raguz's misstatements would render the bond void *ab initio*. Although the applications state that claims arising from existing knowledge or information "shall be excluded from coverage," this language does not state the bond itself would be void, void *ab initio*, or "null and without effect," as cases finding this prong of the *Boggs* test have generally required. *See e.g. Personal Service Insurance Co. v. Lester*, 2006 WL 2796253 at * 5 (Ohio App. 4th Dist. Sept. 25, 2006) (finding second prong of *Boggs* satisfied where the policy states that "[w]e may void coverage under this policy if you or an insured person have knowingly concealed or misrepresented any material fact or circumstance * * * If we void this policy, it will be void from its inception (void *ab initio*), as if the policy never took effect"); *Winston*, 2001 WL 395154 at * 3 (finding second prong of *Boggs* satisfied

33

where policy states "[t]his policy is void in any case of fraud by you relating to it.  It is also void if you intentionally conceal or misrepresent a material fact or circumstance"); *Unencumbered Assets*, 817 F.Supp2d at 1028 (finding second prong of *Boggs* satisfied where policy states that "[i]n the event that any statement or misrepresentation in the Application is untrue, this Policy shall be void and of no effect whatsoever").

Moreover, even assuming this language would be sufficient, it does not appear in the bond itself.  Rather, it appears only in the applications, which (as discussed above) are not incorporated into the bond.  As set forth in *Boggs*, "[i]f it is [the insurer's] purpose to provide that misstatement by the insured shall render the policy void *ab initio*, such facts must appear clearly and unambiguously **from the terms of the policy**."  *Boggs*, 27 Ohio St.2d at 219 (emphasis added).  Because the language at issue appears only in the applications, and the applications are not incorporated into the bond, the Court finds the language cited by CUMIS insufficient to satisfy the second prong of Boggs.[22]

Accordingly, and for all the reasons set forth above, the Court finds Mr. Raguz's misstatements in the bond renewal applications constitute representations, and not warranties.  Therefore, and pursuant to *Boggs*, CUMIS is not entitled to rescind the bond as void *ab initio*.

Alternatively, CUMIS argues the Court should nonetheless find it is entitled to rescind the bond based on the unreported, state appellate court decision in *Empire Sec. Corp. of Ohio v.*

---

[22] Citing *Fragatos, supra,* CUMIS argues the necessary warning language need not appear in the bond itself, so long as it is set forth in the applications. The Court disagrees.  In *Fragatos*, the court found that the policy at issue expressly incorporated the application containing the misstatements.  *Fragatos*, 190 Ohio App.3d at 121-122.  It then concluded that "the application's warning that any material misrepresentation would render the policy 'null and without effect' is equivalent to warning that the policy is void *ab initio*." *Id.* at 122.  Here, however, the bond renewal applications completed by Mr. Raguz were not incorporated into the bond.  Thus, the instant case is distinguishable from *Fragatos*.

*Travelers Indem. Co.*, 1974 WL 184506 (Ohio App. 10th Dist. 1974). In that case, the court considered whether a dishonest employee's knowledge of his fraudulent conduct should be imputed to his employer so as to bar coverage under a fidelity bond. Plaintiff Empire Securities Corporation, a securities broker, procured a fidelity bond from Insurance Company of North America ("INA"). Hugh Davies was a vice-president of Empire during the relevant time period. It was undisputed that Mr. Davies embezzled over $18,000 from Empire, which Empire alleged was covered under the INA fidelity bond. The matter was tried to the trial court, with judgment in favor of Empire as to its claims against INA under the bond. INA appealed, arguing that "the trial court erred in failing to hold that the statements made in Empire's application for the INA Bond were warranties and that because those warranties were false, Empire may not recover on the INA Bond." *Id.* at * 2.

The court engaged in a lengthy discussion of the doctrine of imputed knowledge; the adverse interest exception to that doctrine; and, an exception to the adverse interest exception commonly known as the "sole actor" rule.[23] Applying these doctrines in the context of the

---

[23] Under Ohio law, a principal is generally liable for the knowledge received and the conduct committed by an agent acting within the scope of his or her employment. *See In re National Century Financial Enterprises, Inc.*, 783 F.Supp.2d 1003, 1015 (S.D. Ohio 2011) (citing Ohio cases). An exception, however, exists if the agent acts adversely to the principal and entirely for his own, or another's, purpose. *Id. See also First Nat'l Bank of New Bremen v. Burns*, 88 Ohio St. 434, 438 (1913). Under this exception, "the independent fraud of an agent acting 'on his own account' will not ordinarily be imputed to the principal." *In re National Century*, 783 F.Supp. 2d at 1015. "Courts have typically found that an agent who uses his office to loot corporate assets has acted adversely to his principal." *Id.* at 1016. Under the "sole actor" exception to the adverse interest exception, "an agent's wrongdoing is directly attributed to the principal if he 'so dominated and controlled' the principal that it 'had not separate mind, will, or existence of its own.'" *Id.* (quoting *In re Dublin Securities, Inc.*, 133 F.3d 377, 380 (6th Cir. 1997)). "'The rationale for this rule is that the sole agent has no one to whom he can impart his knowledge, or from whom he can conceal it, and that the corporation must bear the responsibility for allowing an agent to act without accountability.'" *Id.* (quoting *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 359 (3rd Cir. 2001)).

fidelity bond at issue, the court acknowledged that "courts are not in total agreement as to question of an agent's knowledge as imputable." *Empire*, 1974 WL 184506 at * 8.  However, it nonetheless determined that Mr. Davies' knowledge of his own fraudulent conduct could be imputed to Empire so as to bar coverage under the bond.  *Id*. at * 9.

Based on the *Empire* decision, CUMIS argues Mr. Raguz's knowledge of his fraudulent conduct is imputed to St. Paul (and, in turn, Plaintiff), thereby allowing CUMIS to rescind the bond.  Plaintiff argues *Empire* is distinguishable because it "addressed fraud in the procurement of a fidelity bond" and "had no occasion to consider whether the language of the bond permitted rescission under the two-prong test in *Boggs*."  (Doc. No. 98 at 19.)  Specifically, Plaintiff asserts that *Empire* does not address whether the CUMIS bond is written such as to allow it to be rescinded, which it claims is "an issue for which black letter law in Ohio exists, in the *Boggs* decision."  *Id*. at 20.

The Court agrees with Plaintiff.  The Ohio Supreme Court's decision in *Boggs* applies where an insurance company seeks to rescind a policy on the basis of material misrepresentations in an insurance application.  This Court has found, for the reasons set forth at length *supra,* that *Boggs* applies to the fidelity bond at issue herein and, further, that Mr. Raguz's misstatements in the bond renewal applications do not constitute warranties under the two-pronged *Boggs* test routinely applied by Ohio courts.  Accordingly, it is not relevant whether Mr. Raguz's knowledge of his own fraudulent conduct may or may not be imputed to St. Paul.  As Mr. Raguz's misstatements do not constitute warranties under *Boggs*, CUMIS is not entitled to rescind the bond as void *ab initio*.  The *Empire* decision does not require a different result.[24]

_____

[24] In the alternative to arguing that *Boggs* is the relevant test, Plaintiff asserts the adverse interest exception applies and, therefore, Raguz's knowledge is not imputed to St. Paul. Citing

Accordingly, and for all the reasons set forth above, the Court finds CUMIS is not entitled to summary judgment in its favor on the basis of rescission as a matter of law. Moreover, while the Court agrees with Plaintiff on this issue, Plaintiff is not entitled to summary judgment in its favor on the ultimate issue of coverage under the bond as CUMIS raises three additional, independent grounds for denying coverage.  These grounds will be discussed below.

**C.      Termination**

CUMIS argues it is entitled to summary judgment in its favor under the fidelity bond's Termination provision. That provision states as follows:

> **9.      Termination Or Limitation Of Coverage For Employee Or Director**
>
> 1.   This Bond's coverage for an "employee" or "director" terminates immediately when one of your "directors," officers or supervisory staff not in collusion with such person learns of:
>
>     a.    Any dishonest or fraudulent act committed by such "employee" or "director" at any time, whether or not related to your activities or of the type covered under this Bond; or
>
>     b.    Any termination of bond coverage for such "employee" or "director" by any bonding company, which coverage was not reinstated.
>
> 2.   At our sole option, we may terminate coverage for an "employee" or "director."  Such termination will be effective 15 days after receipt by you, and by your state and federal supervisory authority if required by law, of written notice of such termination for us.
>
> 3.   Termination of coverage for an "employee" or "director" under paragraphs 1. or 2. above terminates our liability for any loss

---

cases from the Eighth and Second Circuits, CUMIS argues the adverse interest exception does not apply "when the principal is attempting to benefit directly from the agent's actions, which in this case is the procurement of insurance."  (Doc. No. 100 at 11.)  CUMIS, however, does not cite any Ohio law applying this exception to the adverse interest rule.

> resulting from any act or omission by that "employee" or "director" occurring after the effective date of such termination.

4.   At our sole option, we may issue an endorsement applying a separate deductible or limit of liability, or both, for acts or omissions of any "employee" or "director."  Such endorsement will be effective 15 days after receipt by you, and by your state and federal supervisory authority, if required.

(Doc. No. 90-2 at 69-70.)[25]

CUMIS asserts Mirjana Zovkic, the "office manager" of St. Paul's Eastlake branch, qualifies as supervisory staff under the above provision.  It maintains coverage terminated for Mr. Raguz no later than April 1, 2008 because, by that date, Ms. Zovkic knew Mr. Raguz was falsifying loans and loan documents.  (Doc. No. 88-1 at 7.)  Because the claim was not made until April 2010 when Mr. Raguz was no longer covered by the bond, CUMIS asserts Plaintiff's claim for Mr. Raguz's dishonest acts is not covered.

Plaintiff emphasizes that the term "supervisory staff" is not defined in the bond and argues that term should therefore be strictly construed against CUMIS.  It further argues Ms. Zovkic did not constitute supervisory staff because deposition testimony reveals she did not manage "staff" and had no supervisory responsibilities.  Plaintiff also maintains there is no evidence Ms. Zovkic knew Mr. Raguz had committed any dishonest or fraudulent act prior to liquidation.  Moreover, Plaintiff asserts that "to the extent Ms. Zovkic is deemed to be 'supervisory staff' and did know of [Mr. Raguz's] dishonest acts, then she was in collusion with him by conducting the transactions that brought about the loss, failing to report the same to the authorities and generally assisting in the continuation of the scheme."  (Doc. No. 98 at 25.)

---

[25] The bond states that "[w]ords and phrases appearing in quotation marks . . . are defined under the Definitions section of this Bond."  (Doc. No. 90-2 at 20.)

38

Finally, Plaintiff maintains that, even if coverage did terminate, "the termination condition could only be triggered after the effective date of the policy at issue, in this case February 11, 2010." (Doc. No. 90 at 27.)

The deposition testimony reflects the following. Ms. Zovkic first came to work at St. Paul in 1993.[26] (Zovkic Depo. at Tr. 14.) She was hired by Joe Plavac and was not given an official title at that time. *Id*. at Tr. 14-16. Ms. Zovkic testified she moved with her family to Croatia in August 2000, and returned to the United States in January 2002. *Id.* at Tr. 60-61. She rejoined St. Paul in the fall of 2003, performing the same position she had before she left. *Id.* at Tr. 61. In 2006 or 2007, Ms. Zovkic was given the title "operations manager;" however, there was "no change in anything she was doing." *Id*. at Tr. 17-18. Ms. Zovkic described her job responsibilities as follows:

Q:    What were your duties and responsibilities when you had this title of operation manager?

A:    My day-to-day duties comprised of the nuts and bolts of the workings of the credit union, working with members, member resolution problems with our data processing vendor in terms of account balances, deposits, withdrawals, trying to get those resolved, any customer member– any problem they had.

Another big problem was daily we would do a download– actually, this maybe the time– again, I'm not certain. We introduced checking accounts and debit cards, which we did not have for a long time.

So I was one of the key people and nuts and bolts of getting the checking accounts set up for members, with the vendor, debit card application and processing debit resolutions, fraud issues with the debit cards.

So that was my day to day. IRAs– I was knowledgeable with IRAs, because all my prior – so IRAs– I handled the IRAs, mortgages; I was

---

[26] Prior to working at St. Paul, Ms. Zovkic worked first as an assistant manager and then as a branch manager at Ameritrust. *Id.* at Tr. 12-14.

familiar with the title company and the mortgage as far as putting the proper liens to get our security on our mortgage for an automobile title.

So those were– those were my – the majority of my responsibilities.

Q: So would it be fair to say you ran the day-to-day operations of the credit union?

A: Yes, sir.

*Id.* at Tr. 19-20. Later, on examination by Plaintiff's counsel, Ms. Zovkic clarified her testimony:

Q: There were several questions asked to you where you were asked what your job duties were, and I think that it was put that you ran the day-to-day operations, that the employees were under your control, that you were somehow in charge, and I'm– I need to ask you: Were you in charge?

A: No. The understanding, Tony was in charge. Everybody understood that. He was my boss; he was everybody's boss.

Q: Okay. You weren't a supervisor, were you?

A: No.

Q: You were an employee?

A: Yes.

Q: * * * Did you have any employees under your control?

A: No, sir. We were equal.

*Id.* at Tr. 96-97.

Mr. Raguz also testified regarding Ms. Zovkic's job responsibilities. He stated he created the title of "office manager" for Ms. Zovkic because it recognized the fact that he "entrusted" her with that position. (Raguz Depo. at Tr. 147.) Mr. Raguz described her role as "keeping control of the tellers" and keeping "an eye on" the Eastlake branch. *Id.* at Tr. 20, 22.

40

Specifically, he stated Ms. Zovkic "managed the teller operations to make sure that they balanced, find the differences if there were differences, do supplies, audits of cash, that kind of stuff," as well as "[m]aking sure tellers were aware of any procedure change as far as tellers, making sure the customer service aspect was good." *Id.* at Tr. 20. Mr. Raguz emphasized that he, and he alone, was the "supervisor" of St. Paul. *Id.* at 148. However, he also acknowledged that Ms. Zovkic occasionally assisted him by sitting in on interviews of potential job candidates "so we both hear the same thing." *Id.* at Tr. 152. He indicated, though, that he had the "last say" in terms of hiring decisions. *Id.*

 The Court finds the term "supervisory staff" is ambiguous in the context of the Termination provision. As noted *supra*, the bond itself contains no definition. The plain and ordinary meaning of the term "supervisor" is not particularly helpful in this context either. Black's Law Dictionary defines "supervisor" as "one having authority over others; a manager or overseer." *Black's Law Dictionary*, 8th Ed. (2004). However, this definition does not provide much guidance with respect to the nature and scope of the authority contemplated by the use of the term "supervisory staff" in the Termination Provision of the fidelity bond at issue. For example, it is unclear whether a person who has some authority (such as the authority to authorize leave or implement employee procedures, for example) but not the authority to hire or fire would qualify as "supervisory staff" under the policy. Indeed, the term "supervisory staff" could reasonably be interpreted to encompass a person with the limited authority described above, or could just as reasonably be interpreted to not include such a person. Because the term is susceptible to more than one reasonable interpretation, the Court finds it must be construed against CUMIS and in favor of St. Paul (i.e., Plaintiff). *See Lager,* 120 Ohio St.3d at 49-50;

*Honeybaked Foods, Inc.,* 757 F.Supp.2d at 745.[27]

> Plaintiff suggests the following definition of the term "supervisor" applies herein:
>
> The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, **or responsibly to direct them**, or to adjust their grievances, or effectively to recommend such action, **if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.**

29 U.S.C. § 152(11) (emphasis added).[28] (Doc. No. 90 at 23, fn 1.) Whether this, or some other definition applies, the Court finds there is a genuine issue of material fact regarding whether Ms. Zovkic qualifies as "supervisory staff" under the Termination provision. CUMIS cites deposition testimony suggesting Ms. Zovkic had the authority to direct other employees at the Eastlake branch and, further, that the exercise of this authority was not of a merely routine or clerical nature. For instance, Mr. Raguz testified it was Ms. Zovkic's responsibility to "keep[] control of the tellers" at the Eastlake branch, and to make sure "tellers were aware of any procedure change as far as tellers, making sure the customer service aspect was good." (Raguz

---

[27] As noted *supra*, CUMIS asserts this rule of construction (i.e., that ambiguity in a contract term is strictly construed against the insurer) does not apply in the context of fidelity bonds. As explained in footnote 14 of this Opinion, *supra*, CUMIS does not cite any authority indicating that Ohio courts would not apply the rule of construction in the context of fidelity bonds. In fact, several courts have cited this principle in interpreting fidelity bonds under Ohio law. *See e.g. First Defiance Financial Corp.*, 688 F. Supp.2d at 706; *First National Bank of Dillonvale*, 94 Ohio App.3d at 373. Moreover, while CUMIS argues that fidelity bonds are treated differently "due to the special nature of the creation of the bond, for which representatives from the banking industry and the insurance industry met and drafted the policy together," it does not direct this Court's attention to any evidence in the form of affidavits or deposition testimony that the fidelity bond issued to St. Paul was created and drafted in such a manner. (Doc. No. 100 at 14-15.)

[28] This definition is taken from United States Code provisions relating to National Labor Relations. Plaintiff does not explain why it believes this particular definition should apply to the use of the term "supervisory staff" in the context of the fidelity bond at issue.

Depo. at Tr. 20, 22.)  He also testified Ms. Zovkic had at least some involvement in personnel decisions, including participating in interviews with job applicants.  *Id*. at Tr. 152.  On the other hand, both Mr. Raguz and Ms. Zovkic emphatically indicated that Ms. Zovkic was not a supervisor and it was Mr. Raguz who "managed personnel."  (Raguz Depo. at Tr. 148, 152; Zovkic Depo. at Tr. 96-97.)  Moreover, Ms. Zovkic specifically stated she did not have any control over other employees at St. Paul.  (Zovkic Depo. at Tr. 96-97.)

Based on the above, the Court finds a genuine issue of material fact exists regarding whether Ms. Zovkic qualified as "supervisory staff."  Specifically, construing the facts in a light most favorable to Plaintiff for purposes of CUMIS' Motion for Summary Judgment on this issue, the Court finds the above deposition testimony that Ms. Zovkic was not a supervisor and not "in charge of" any other employee creates a genuine issue of material fact as to whether she qualified as "supervisory staff" under the definition suggested by Plaintiff.  Conversely, construing the facts in a light most favorable to CUMIS for purposes of Plaintiff's Motion for Summary Judgment on this issue, the Court finds deposition testimony indicating Ms. Zovkic "kept control of the tellers;" implemented employee procedures and regulations; and, participated in job applicant interviews creates a genuine issue of material fact that precludes judgment on this issue in Plaintiff's favor.

The Court similarly finds a genuine issue of material fact exists with respect to whether Ms. Zovkic "learn[ed] of" any "dishonest or fraudulent act" committed by Mr. Raguz.  Ms. Zovkic testified that she understood Mr. Raguz was resetting loans; i.e., making it appear loans were current even though they were delinquent.  (Zovkic Depo. at Tr. 38.)  However, she also stated she was "not sure what reset meant" and "a lot of the names [on the loans] were unfamiliar

43

to me" and "I really didn't understand what the intent of it was at the time." *Id*. at Tr. 37. Similarly, Ms. Zovkic acknowledged that Mr. Raguz would occasionally ask employees at St. Paul to "show on the books and records of the credit union that a loan was being made was backed by share certificates owned by somebody else."[29]  *Id*. at 84-85.  However, she also testified she did not know "all the circumstances and parties involved" and whether "there was an understanding or not."  *Id*. at Tr. 85.  Finally, Ms. Zovkic stated that "on occasion" she observed Mr. Raguz request that another employee (Debbi Politi) "sign someone's name that was not her own" on certain loan documents.  *Id*. at Tr. 70.  However, again, Ms. Zovkic testified she did not "know whose name or if it was authorized or of the circumstances surrounding that." *Id.* at Tr. 69-70.  She also testified she did not know whether Mr. Raguz's request that Ms. Politi sign someone else's name to a loan document was "part of an effort to make the loan files look legit."  *Id*. at Tr. 70-72.  The Court finds this testimony creates a genuine issue of material fact regarding whether Ms. Zovkic "learned of" any "dishonest or fraudulent act" committed by Mr. Raguz sufficient to terminate coverage for him under the bond.

Finally, Plaintiff argues that "the termination condition could only be triggered after the effective date of the policy at issue, in this case February 11, 2010." (Doc. No. 90 at 27.)  Thus, Plaintiff maintains that coverage could only have terminated as early as February 11, 2010, by which time losses in excess of the $5 million bond limit had already been suffered.  *Id*.  Plaintiff cites a North Carolina appellate decision, *Home Savings Bank SSB of Eden v. Colonial American Cas. & Surety Co.*, 165 N.C. App. 189 (2004), in support of this argument.

---

[29]  St. Paul's account holders owned shares of the credit union and were, therefore, considered owners or "members" of the credit union.  St. Paul issued "share-secured" personal and consumer loans to its members.  "Share-secured" meant that the particular borrower pledged funds on deposit with St. Paul that matched or exceeded the loan amount.

CUMIS argues decisions from this court and the Sixth Circuit have held that a termination provision may be invoked where the insured learned of employee dishonesty prior to the policy year in place when the claim was made.  (Doc. No. 97 at 7-8.)  In support of this assertion, CUMIS cites *City Loan & Sav. Co. v. Employers Liability Assurance Corporation*, 249 F. Supp. 633 (N.D. Ohio 1964) and *William C. Roney & Co. v. Fed. Ins. Co.*, 674 F.2d 587 (6th Cir. 1982) (applying Michigan law).

The Court will not reach the legal issue of whether a bond's termination provision may be invoked where an insured had prior knowledge of employee dishonesty.  In the cases cited by both parties, it was either undisputed or (in the case of *City Loan & Sav. Co., supra*) had been found as a finding of fact after bench trial, that the insured had actual knowledge of the dishonest conduct of its employee prior to the effective date of the bond at issue.  *See City Loan & Sav. Co*, 249 F.Supp. at 647; *Home Savings Bank*, 165 N.C. App. at 267; *Roney*, 674 F.2d at 589.  Here, however, the Court has found there is a genuine issue of material fact regarding whether Ms. Zovkic "learned of" a dishonest or fraudulent act of Mr. Raguz prior to the effective date of the bond.  On this basis, the Court finds the authority cited by the parties distinguishable from the instant case.

Accordingly, and for all the reasons set forth above, the Court finds that neither Plaintiff or CUMIS is entitled to summary judgment in their favor on the issue of whether coverage for Mr. Raguz terminated under the bond by virtue of Ms. Zovkic's alleged knowledge of Mr. Raguz's dishonest conduct.

**D.      Discovery of Loss and Period of Limitations Provisions**

CUMIS argues it is entitled to summary judgment in its favor under the Bond's

45

Discovery of Loss and period of limitations provisions.  Those provisions state as follows:

> **10.**  **Discovery of Loss**
>
> This Bond applies to loss discovered by you while this Bond is in effect. **Discovery occurs when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered under this Bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred**.  The exact amount or details of loss may not be known at the time of discovery.
>
> Discovery also occurs when you receive notice of an actual or potential claim alleging that you are liable to a third party under circumstances which, if true, would constitute a loss under this Bond.
>
> \* \* \*
>
> **17.**  **Legal Action Against Us**
>
> **Legal proceedings against us to recover loss under this Bond:**
>
> a.  Cannot be brought before the expiration of 60 days after the original proof of loss; and
>
> **b.**  **Must be brought within two years of Discovery of Loss.**

(Doc. No. 90-2 at 70, 73) (emphasis added).

CUMIS argues that, by April 1, 2008, the St. Paul Board of Directors (hereinafter "the Board") knew two "critical facts" which constituted discovery of loss under the bond.  First, CUMIS asserts that, by January 2008, the Board "had been told for seven years that St. Paul had zero delinquencies even though its loan portfolio was nearly $165 million."  (Doc. No. 88-1 at 14.)  CUMIS claims there were no other credit unions in the United States at that time that had both over $150 million in loans and zero delinquencies.  Second, CUMIS claims that, on April 1, 2008, the Board received an NCUA Examination Report dated December 2007 which disclosed that share-secured loans ($131.2 million) exceeded share-secured deposits ($122.5 million) by

46

$8.7 million.  CUMIS maintains that "[n]eedless to say, this is impossible." *Id.*  Based on these two facts, CUMIS argues the Board became aware, by April 2008, of facts that "would cause a reasonable person to assume that a loss of they type covered under this Bond has been or will be incurred." *Id.*  Because the bond contains a two year period of limitations provision, and suit was not filed within two years of April 2008, CUMIS maintains the instant action is time-barred.

Relying on its expert report, Plaintiff argues the Board reasonably relied on both its own outside auditing reports, as well as NCUA examination reports, none of which detected any fraud.  (Doc. No. 98 at 25-26.)  Indeed, Plaintiff emphasizes that the NCUA reports "repeatedly and consistently gave a CAMEL 2 rating to St. Paul until the end of 2009." *Id*. at 25.  Plaintiff further argues CUMIS misconstrues the December 2007 NCUA examination report and "ignore[s] vital information that explains the situation as nothing more than simply 'a problem with reporting of loans by type.'" *Id*. at 26.  Finally, Plaintiff claims actual knowledge is required to demonstrate discovery of loss, and the fact that the Board was aware of continuous zero delinquency report was not sufficient to constitute "actual knowledge" of a loss.

The record reflects the following.  Mr. Raguz testified he kept his fraudulent conduct a secret "from everybody," including the Board, the Supervisory Committee, and the NCUA examiners.  (Raguz Depo. at Tr. 145.)  St. Paul Board member Robert Calevich testified that, as late as December 2009, the Board "had no idea there was a fraud going on" at St. Paul. (Calevich Depo. at Tr.  237.)  He further stated he had "no knowledge of any irregularities of any sort" in terms of Mr. Raguz's management of the credit union until early 2010.  (Calevich. Depo. at Tr. 29-30, 314.)  Likewise, Mr. Raguz's father, St. Paul Board member Luke Raguz, testified he did not know about his son's fraudulent scheme until just prior to liquidation in 2010.  (L.

47

Raguz Depo. at Tr. 68-69.)  In sum, CUMIS directs this Court's attention to no evidence indicating that anyone other than Mr. Raguz had actual knowledge of his fraudulent scheme prior to 2010.

The question, then, is whether the Board became "aware of facts which would cause a reasonable person to assume that a loss of the type covered under this Bond has been or will be incurred" and, if so, when.  CUMIS asserts the Board's knowledge that St. Paul had reported a zero delinquency rate for seven years, as well as its knowledge that St. Paul's share-secured loans exceeded share-secured deposits by over $8 million in 2007, would have alerted a "reasonable person" to Mr. Raguz's fraudulent conduct.  Mr. Calevich acknowledged that, between 2006 and 2008, the Board was told at every monthly meeting that St. Paul had a zero delinquency rate.  (Calevich Depo. at Tr. 93.)  Moreover, the record reflects the Board received copies of NCUA examination reports for the years 2004 to 2009, each of which reported a zero delinquency rate.  *See* Doc. No. 89-1; Raguz Depo. at Tr. 86-87.  CUMIS asserts that one of those reports (effective December 31, 2007) disclosed that St. Paul's share-secured loans well exceeded its share-secured deposits.  *See* Doc. No. 89-1 at 9-10.[30]

Despite the above, Mr. Calevich maintained he was not aware of "any irregularities" in Mr. Raguz's management of St. Paul until early 2010.  (Calevich Depo. at Tr. 29-30.)  He reiterated that Mr. Raguz was a "trusted member of the community" and stated it "never even came into my mind that he would do something this big."  *Id*. at Tr. 315-316.  Mr. Calevich acknowledged that, at some point during the relevant time period, the NCUA recommended the

---

[30] Specifically, that report provided that: "[T]here is a problem with the reporting of loans by type. As of 12/31/07, share secured loans are reported as $131.2 million. However, the combined total amount of member share certificates ($97.3 million), IRAs ($18.5 million), and regular shares ($6.7 million) is only $122.5 million.  This needs to be investigated."  *Id*. at 10.

Board engage an independent certified public accountant (CPA) to audit St. Paul.  He further

acknowledged St. Paul elected not do so, explaining that:

> We had no reason to believe that anything was out of kilter when year after year
> the [NCUA] examiner would come in and say, Your loans look like they're in
> good shape, increase your credit line a little bit here and do this. We'd do those
> things, and then next year the [NCUA] examiner comes back and tells us the same
> thing and its in the report.  So we had no reason to go beyond that.

(Calevich Depo. at Tr. 93.)[31]  Additionally, Mr. Calevich explained that, at some point in 2008,

the Board requested additional information from Mr. Raguz on several occasions about the

share- secured loans, but Mr. Raguz did not provide the requested information.  *Id.* at Tr. 227-

230.  Mr. Calevich testified as follows:

> Q:    Did the board have any suspicions that something might be amiss when
>       [Mr. Raguz] continually refused to provide this basic information?
>
> A:    I mean, we had concern in the fact that we continued to make more and
>       more shared secured loans, at the same time we're getting more and more
>       share secured certificates of deposits.  Things were evening out on the
>       books anyway, and all the ratios and measures that we use were headed in
>       the right direction.  The capital ratio was growing at this time, which was
>       cited on one of the examiner reports.
>
> Q:    But it was all fake, right? I mean, the share certificates were not there.
>
>                              * * *
>
> A:    In March 2010 we found out that it was all fake.
>
> Q:    So when you had the discussion– and not using my words, but raised your
>       concerns with Tony about getting this basic information and he still didn't
>       provide it, and you go through all of 2009 and you don't get the
>       information, did anyone on the board recommend that Tony be removed
>       and someone else be brought in to at least look at the situation?

---

[31]  Moreover, St. Paul's auditor, George Hanks, did not uncover Mr. Raguz's fraud and,
instead, consistently reported that there were no outstanding issues regarding credit union
records or account balances.  *See* Calevich Depo. at Tr. 120-121; Doc. No. 88-7.

A:    I think the board depended on the NCUA examiner and the internal audit
to bring things to the forefront.

Q:    So, the board depended on the NCUA auditors, and the board depended on
Mr. Hanks, correct?

A:    Yes.

Q:    And with those two measures in place, the board felt that even though
Tony was ignoring direct orders, he could continue with his employment?

A:    Yeah.  I mean– I'm not sure we ever got close to letting him go, if that's
what you mean.

*Id.* at Tr. 229-230.

Not surprisingly, the parties' experts come to different conclusions regarding the above evidence.  CUMIS' expert, Robert Kravetz, concludes the Board "failed in their responsibilities as early at 2005 and maybe as early as 2002 when reports started showing no delinquent loans." (Doc. No. 62-1 at 4.)  He states that "[y]ear-after-year of no reported delinquent loans, coupled with the dramatic increase in loans made, most certainly should have alerted the Board of Directors that further inquiry and investigation was necessary and, in fact, essential."  *Id.*  Mr. Kravetz further opines that Mr. Raguz's "failure to provide the requested information to the Board [in 2008] should have been a crystal clear indication that there was a serious problem with the loan portfolio and that a possible fraud may have existed yet it was not pursued by the Board."  *Id.*  Thus, Mr. Kravetz concludes as follows: "In sum, there were many obvious indicators that should have alerted the Board of Directors as early as 2002, at least by 2005, and certainly not later than 2008, that there was a serious problem.  It is my opinion that the Board completely failed in its responsibilities and that their failure continued until the demise of this Credit Union.  It is also my opinion that any responsible Board Member would have investigated

50

the warning signs which foretold a massive fraud." *Id.*

Plaintiff's expert, Christine Dawe, reaches the opposite conclusion. (Doc. No. 90-3.) Ms. Dawe opines that "the Board and Supervisory Committee of St. Paul fulfilled their responsibilities to the members of St. Paul by hiring and depending on external specialists to review the books and records." *Id*. at 23-25. With regard to the continuous zero delinquency rate issue, she states:

> Mr. Kravetz's assertion that St. Paul's Board of Directors should have been alerted that further inquiry and investigation was necessary because the delinquency ratio was zero is cursory and misses the point. . . St. Paul's delinquency ratio was less than one percent in 1995, when Joseph Plavac retired, with 85% of the loan portfolio made up of real estate loans . . . When the loan mix began to change from primarily real estate loans to share secured loans, the Board would not have been surprised or alerted to a problem with a zero delinquency because the loans could be paid in full before they became 60 days delinquent and reported on the Call Report. * * * Furthermore, each NCUA examination reflected a recognition of the zero delinquency and the fact that with a primarily share secured portfolio, this would be expected and was acknowledged.

*Id*. at 33-35. With regard to CUMIS' assertion that the 2007 NCUA Examination Report indicated St. Paul's share-secured loans exceeded its share-secured deposits, Ms. Dawe disagrees with CUMIS' reading of that report, opining that "[t]he discussion [in the NCUA report] was related to the reporting of loan types, not that the loans were not collateralized." *Id*. at 35. In sum, Ms. Dawe concludes as follows: "If experienced NCUA examiners and trained, experienced auditors did not detect the loan fraud at St. Paul, how can the Board of Directors and Supervisory Committee be expected to do so? In other words, the Board and Supervisory Committee did not fall below industry standards when they did not detect the fraud. It would be unreasonable, under the facts and circumstances, for the Board and Supervisory Committee to suspect the fraud." *Id.* at 39.

Courts have generally found that "mere suspicion" is not enough to constitute discovery of the loss.  *See e.g. FDIC v. Aetna Casualty & Surety Co.*, 903 F.2d 1073, 1079 (6th Cir. 1990) (noting that "suspicion of loss is not enough.")  Here, the CUMIS bond incorporates a reasonable person standard by providing that discovery occurs "when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered under this Bond has been or will be incurred."  (Doc. No. 90-2 at 70.)  Although recognizing that "mere suspicion" is not sufficient, courts interpreting the very same discovery of loss language presented in the CUMIS bond herein have construed it as "anticipating a determination by a trier of fact."  *FDIC v. Reliance Insurance Corporation*, 716 F. Supp. 1001, 1002 (E.D. Ky 1989) (Siler, J.).  As explained in *Reliance*:

> Case law generally defines discovery in terms of actual knowledge, rather than merely a suspicion.  *See American Surety Co. v. Pauly*, 170 U.S. 133, 145, 18 S.Ct. 552, 557, 42 L.Ed. 977 (1898); *Federal Deposit Insurance Corporation v. Lott*, 460 F.2d 82 (5th Cir.1972); *Maryland Casualty Co. v. Magoffin Co. Board of Education*, 358 S.W.2d 353, 358 (Ky.1961).  **The Bond's own definition of discovery incorporates a reasonable person standard, anticipating a determination by a trier of fact.  *See United States Fidelity & Guaranty Co. v. Empire State Bank*, 448 F.2d 360, 364 (8th Cir.1971) ("In determining when discovery has taken place, the trier of fact must find pertinent underlying facts known to the insured and must further determine subjective conclusions reasonably drawn therefrom.").**  Plaintiff has entered an affidavit from George Hogg, a member of the Bank's Board of Directors, attesting that the Board did not know or suspect the dishonesty of Ruley and Knipp prior to July, 1986.  **This affidavit presents material issues of fact as to both the timing and quality of knowledge acquired by the Board.  Therefore, the date of discovery cannot be determined by the Court as a matter of law.**  As the discovery date will ultimately determine the timeliness of notice, summary judgment is inappropriate on the issues of initial notice and commencement of litigation.

*Id*. at 1002-1003 (emphasis added).  *See also Central National Life Insurance Co. v. Fidelity & Deposit Company of Maryland*, 626 F.2d 537 (7th Cir. 1980) (reversing grant of summary

judgment in favor of fidelity insurer because the issue of when the loss resulting from dishonest or fraudulent acts was discovered constituted a "disputed issue" for the trier of fact); 13 *Couch on Insurance*, 3rd ed., § 190:14 ("Whether or not the employer discovered a loss is generally a jury question, at least where some evidence tends to show the required degree of knowledge. In addition, the question whether the insured acquired knowledge from which he or she might reasonably conclude that his or her employee had been committing fraudulent and dishonest acts is a mixed question of law and fact to be submitted to the jury.")

The Court finds there is a genuine issue of material fact regarding whether (and, if so, when) the Board became "aware of facts which would cause a reasonable person to assume that a loss of a type covered under this Bond has been or will be incurred." While Mr. Calevich testified he was not aware of "any irregularities" in Mr. Raguz's management of St. Paul until early 2010, he also acknowledged the Board had "a concern about the total amount of [share-secured] loans" which led to the Board's repeated (and unheeded) requests for information from Mr. Raguz. (Calevich Depo. at Tr. 29-30, 61.) Mr. Calevich further acknowledged that "at least a year before the truth was known," either he or fellow Board member Nikola Franic "suspected something was wrong [but] just couldn't figure out what it was." *Id.* at Tr. 103. Moreover, while Plaintiff's expert opines that the Board's reliance on the reports of the NCUA and Mr. Hanks was reasonable, CUMIS' expert concludes the precise opposite, asserting that the information available would have caused "any responsible Board Member [to] investigate[] the warning signs which foretold a massive fraud." (Doc. No. 62-1 at 4.)

The Court finds the testimony and evidence discussed above create a material issue of fact regarding "the timing and quality of knowledge acquired by the Board," *FDIC v. Reliance*

*Insurance Corporation*, 716 F. Supp. at 1002, and whether that information was sufficient to constitute discovery of the loss under the bond.   Accordingly, CUMIS is not entitled to summary judgment in its favor on the basis of the bond's Discovery of Loss and period of limitations provisions.

> **E.**     **Causation**

CUMIS next argues it is entitled to summary judgment in its favor because Plaintiff has failed to demonstrate that the loss for which it is seeking coverage under the bond resulted directly from Mr. Raguz's dishonesty.  CUMIS notes the bond provides that: "[w]e will pay you for your **loss resulting directly from dishonest acts committed by an 'employee' or 'director,** acting alone or in collusion with others." (Doc. No. 90-2 at 20) (emphasis added).  CUMIS maintains Plaintiff's corporate designee, Jennifer Murphy, was unable in deposition to tie any losses directly to Mr. Raguz's dishonest conduct, noting her testimony that neither she nor anyone in her department had prepared a list of loans on which Plaintiff's bond claim is based.  (Murphy Depo. at Tr. 88-89.)

CUMIS also emphasizes that Plaintiff has filed at least twelve other lawsuits in this District against individual borrowers, seeking to recover "millions of damages" for fraud, misrepresentations, and/or omissions of fact in connection with loans obtained from St. Paul beginning in 2002.  *See e.g., NCUAB v. Loncarevic, et al.*, Case No. 1:13cv00227 (N.D. Ohio) (Boyko, J.); *NCUAB v. Zovkic, et al.*, Case No. 1:13cv1148 (N.D. Ohio) (White, M.J.); *NCUAB v. Medic, et al.*, Case No. 1:12cv3128 (N.D. Ohio) (Oliver, J.); *NCUAB v. Vukovic, et al.*, Case No. 1:13cv1064 (N.D. Ohio) (Gwin, J.).  Although aware that suits against individual borrowers had been filed, Ms. Murphy was not able to quantify how much of the loss was caused by Mr. Raguz

as opposed to borrower fraud.  (Murphy Depo. at Tr. 51-53.)  Accordingly, CUMIS argues it is entitled to summary judgment because Plaintiff has failed to demonstrate that the loss resulted directly from Mr. Raguz's dishonest conduct.

Plaintiff argues it has proved that "the loss in question far exceeded CUMIS' $5 million Bond limit [and] that all the damages were caused by" Mr. Raguz's dishonesty.  (Doc. No. 98 at 31.)  It notes that the Lillie & Company Report dated October 2010 documented damages in excess of $72 million as a result of Mr. Raguz's fraudulent scheme.  Plaintiff further cites deposition testimony from Ms. Murphy that "all 72 million" was a result of Mr. Raguz's dishonest conduct.  (Murphy Depo. at Tr. 51.)  Additionally, Plaintiff notes the following remarks by the district court judge during Mr. Raguz's sentencing hearing in his criminal case:

> You were very much so the center of St. Paul's universe.  Without you nothing really happened. The money did not move.  You were the one authorizing the loans, approving them, steering the ship, even though it went off a cliff, but you were the man.
>
> And I was looking at this, and you issued more than a thousand fraudulent loans. Let's stop and think about that for a second.  That would be the equivalent of one fraudulent loan per day for almost three years.  That's unbelievable.  You accepted roughly $1 million in bribes to facilitate these fraudulent loans.
>
> As we've heard, you're directly responsible for the collapse of St. Paul credit union, the largest credit union collapse in U.S. history.  Well, when you look in the mirror, you can thank that person.

*United States v. Raguz*, Case No. 1:11cr00008 (N.D. Ohio) (Boyko, J.) at Doc. No. 178 at 26. Finally, with respect to the lawsuits filed against individual borrowers, Plaintiff asserts "there is not a scintilla of evidence or any conclusion that could ever be reached to support a finding that borrowers alone, without the substantial and continuous assistance of Tony Raguz, led to the losses incurred by the Liquidating Agent."  (Doc. No. 98 at 33.)

In response, CUMIS notes that legitimate loans went delinquent during the relevant time period and asserts that "Plaintiff cannot distinguish St. Paul's losses that stem from legitimate loans from those that stem from loans that would not have issued but for Raguz's dishonesty." (Doc. No. 100 at 22.)  By way of example, CUMIS argues that "if a legitimate loan for $1 million was issued by St. Paul and the loan went delinquent because the borrower could not pay, the loan is not covered just because Raguz 'reset' the loan by incurring interest, which is also not covered by the bond, and restating the principal."  *Id.*  In particular, CUMIS emphasizes Mr. Raguz's own testimony that many of his fraudulent practices involved legitimate loans that were heading into default because the borrower could not pay for one reason or another.  (Raguz Depo. at Tr. 157-159.)  Thus, CUMIS asserts that "because Plaintiff is unable to differentiate between good loans and bad loans, between borrower fraud and employee dishonesty, its claim must fail." (Doc. No. 97 at 15.)

The Court finds CUMIS is not entitled to summary judgment in its favor on this issue.  Mr. Raguz's deposition transcript can fairly be read as an acknowledgment that he was responsible for the massive losses and resultant collapse of St. Paul.  Indeed, the federal district court considering his criminal case reached the same conclusion and, on that basis, held Mr. Raguz responsible for over $71.5 million in restitution.  *See U.S. v. Raguz*, Case No. 1:11cr008 (N.D. Ohio) at Doc. Nos. 176, 178 at Tr. 32.  Based on the above, the Court cannot say that Plaintiff has failed to demonstrate it sustained a covered loss under the bond as a result of Mr. Raguz's dishonest conduct.  While Plaintiff will of course be required to demonstrate the *amount* of its loss at trial, the Court is unable to say, given the wealth of evidence regarding Mr. Raguz's dishonest conduct, that CUMIS is entitled to judgment in its favor on the basis that Plaintiff has failed in its burden to

demonstrate a covered loss under the bond.

Accordingly, the Court finds this argument to be without merit.

**V.**     **Conclusion**

Accordingly, and for all the reasons set forth above, Plaintiff's Motion for Summary

Judgment (Doc. No. 90) is DENIED; and, Defendant CUMIS's Motion for Summary Judgment

(Doc. No. 88) is DENIED.

IT IS SO ORDERED.


/s/ Greg White
U.S. Magistrate Judge

Date: April 7, 2015