**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL CREDIT UNION, | ) | |
| ADMINISTRATION BOARD, | ) | CASE NO.  1:11 CV 1739 |
| as Liquidating Agent of | ) | |
| St. Paul Croatian Federal Credit Union, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE GREG WHITE |
| v. | ) | |
| | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| CUMIS INSURANCE SOCIETY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

A bench trial was conducted in the above-captioned case on December 1, 2, 3, and 11, 2015.[1]  (Doc. Nos. 179, 180, 181, 189.)  Closing arguments were heard on December 11, 2015 and post-trial briefing was submitted on December 23, 2015.  (Doc. Nos. 191, 192.)  Thus, this matter is ripe for adjudication.

Pursuant to Fed. R. Civ. P. 52(a), the Court now issues the following findings of fact and conclusions of law based on a careful consideration of the credibility of the witnesses, the trial record, and the parties' written and oral arguments.

For the reasons articulated in more detail below, the Court concludes that Plaintiff National Credit Union Administration Board, in its capacity as Liquidating Agent of St. Paul

---

[1]  This case is before the Court upon consent of the parties entered November 28, 2011. (Doc. No. 13.)

Croatian Federal Credit Union (hereinafter "Plaintiff") is not entitled to a declaration of coverage under the fidelity bond issued to St. Paul by Defendant CUMIS Insurance Society, Inc. in February 2010 for losses arising from employee or director dishonesty.

## I. Procedural Background

Plaintiff filed a Complaint in this Court against Defendant CUMIS Insurance Society, Inc. (hereinafter Defendant or "CUMIS") on August 18, 2011.  (Doc. No. 1.)  Therein, Plaintiff alleges that, on April 30, 2010,[2] the National Credit Union Administration Board placed the St. Paul Croatian Federal Credit Union (hereinafter "St. Paul") into involuntary liquidation due to insolvency and appointed itself the Liquidating Agent pursuant to 12 U.S.C. ¶ 1787(a)(1)(A).  *Id*. at ¶ 6.  As Liquidating Agent, Plaintiff asserts it "assumed all right, title and interest of St. Paul by operation of law."  *Id*. at ¶ 7.  The Complaint contains one count, seeking a declaratory judgment that Defendant owes coverage under a fidelity bond it issued to St. Paul in February 2010 for losses arising from employee or director dishonesty.  *Id*. at ¶¶ 8-19, 32-34.  The following relief is requested: 1) a declaration of Plaintiff's rights under the bond; 2) an Order holding that the claims are covered under the bond; and, 3) an award of compensatory damages, including interest, attorneys' fees and any other relief that the Court deems appropriate and just.  *Id*. at p. 7.  The Complaint does not contain a jury demand.

Defendant filed its Answer on October 24, 2011.  (Doc. No. 4.)  Therein, Defendant "denies that plaintiff is entitled to any of the relief sought in the complaint's 'wherefore' clauses or any other relief."  *Id*. at ¶ 36.  The Answer does not contain a jury demand.

A case management conference was conducted on November 29, 2011, at which time the Court set a discovery deadline of September 1, 2012 and a dispositive motions deadline of October 1, 2012.  (Doc. No. 14.)  These deadlines were extended seven times, in large part due to the parties' numerous discovery disputes.  Ultimately, the discovery deadline was extended to

---

[2] In the Complaint, Plaintiff alleges the National Credit Union Administration Board placed St. Paul into involuntary liquidation and appointed itself the Liquidating Agent on May 1, 2010.  (Doc. No. 1 at ¶ 6.)  The Notice of Involuntary Liquidation and Revocation of Charter attached as an Exhibit to the Complaint, however, is dated April 30, 2010.  (Plaintiff's Exh. A.)

July 28, 2014 and the dispositive motions deadline was extended to October 29, 2014.  *See* Non-Document Order dated April 15, 2014; Doc. No. 71.

The parties timely filed cross motions for summary judgment on October 29, 2014. (Doc. Nos. 88, 90.)  Briefs in Opposition were filed on December 5, 2014, and replies were filed on December 22, 2014.  (Doc. Nos. 97, 98, 99, 100.)

On April 7, 2015, the Court issued a Memorandum Opinion & Order, denying the parties' cross-motions for summary judgment.  (Doc. No. 102.)  Therein, the Court found that genuine issues of material fact remained regarding defenses under the Termination and Discovery of Loss provisions of the Bond.[3]  *Id*. at 37-54.  The Court further found that, although Plaintiff had demonstrated that it sustained a covered loss under the bond, "Plaintiff will of course be required to demonstrate the *amount* of its loss at trial."  *Id*. at 56 (emphasis in original).

A settlement conference was conducted on May 7, 2015; however, the parties were unable to reach an agreement.  (Doc. No. 107.)  Several additional discovery issues were subsequently raised, which ultimately resulted in Defendant filing a Motion to Reopen Discovery on September 18, 2015 and a Motion to Stay Proceedings on October 26, 2015.  (Doc. No. 127, 139.)  Defendant's motions were denied in Opinions & Orders dated October 19, 2015 and October 27, 2015.  (Doc. Nos. 135, 141.)

A Final Pretrial Conference was thereafter conducted on November 3, 2015.  (Doc. No. 165.)  The parties filed their trial briefs on October 27, 2015, and proposed findings of fact and conclusions of law on October 29, 2015.  (Doc. Nos. 150, 151, 152, 153.)  A bench trial was conducted on December 1, 2, 3, and 11, 2015.  (Doc. Nos. 179, 180, 181, 189.)  Closing arguments were conducted on December 11, 2015, and post-trial briefing was submitted on

---

[3] The parties both moved for summary judgment on the issue of rescission.  With respect to this issue, the Court found Defendant was not entitled to summary judgment in its favor on the basis of rescission as a matter of law.  (Doc. No. 102 at 37.)  The Court further found that "while the Court agrees with Plaintiff on this issue, Plaintiff is not entitled to summary judgment in its favor on the ultimate issue of coverage under the bond as CUMIS raises three additional, independent grounds for denying coverage," i.e., Termination, Discovery of Loss; and causation.

3

December 23, 2015.  (Doc. No. 189, 191, 192.)

## II.  Findings of Fact

**A.**     **Background regarding St. Paul Croatian Federal Credit Union**

1.  St. Paul Croatian Federal Credit Union ("St. Paul") was established in 1943 to serve members of the St. Paul Croatian Parish.  (Stipulated Findings of Fact at ¶ 1.)[4]  St. Paul began with a small office in Cleveland.  (Plavac Test. at Tr. 548.)

2.  At all times relevant to the instant action, St. Paul had a Board of Directors and Supervisory Committee.  Robert Calevich was elected to the St. Paul Board of Directors (hereinafter "the Board") in 1988 and served continuously until April 2010, a period of twenty-two (22) years.  During his tenure on the Board, Calevich served in several different capacities. He began as a Board member in 1988 and was elected secretary/treasurer in the mid-1990s.  In March 2005, Calevich was elected President of the Board.  He served as Board President from March 2005 until April 2010.  (Calevich Test. at Tr. 466-467.)

3.  Joseph Plavac served on the Board from 1954 to 2010, a total of fifty-six (56) years. In addition, Plavac worked at St. Paul as the full-time manager of the credit union from 1986 to 1995.  (Plavac Test. at Tr. 544-545; Stipulated Findings of Fact, at ¶ 14.)

4.  Anthony Raguz began working at St. Paul as a teller/loan officer in 1989.  When Plavac retired from his position as manager in 1995, Raguz was hired to replace him.  At some point in 2004, Raguz was given the title of "chief operating officer" of St. Paul.  (Raguz Test. at Tr. 139-140; Defendant's Exh. 1 at CUMIS 013299.)  As far as responsibilities, Raguz testified that nothing changed, explaining he "was the person in charge from the beginning."  (Raguz Test. at Tr. 140.)

5.  When Raguz first became manager, St. Paul had one office in Cleveland and three or four employees.  Over time, St. Paul's assets grew and a second office was opened in Eastlake,

---

[4]  The parties' Stipulated Findings of Fact were filed on November 10, 2015 and can be found at Doc. No. 66.

Ohio.  By April 2010, St. Paul had a total of ten employees working at both offices.  (Raguz Test. at Tr. 140-141.)

6.   At all times relevant to the instant action, St. Paul issued several different types of loans, including real estate loans, car loans, credit card loans, and share-secured loans. (Defendant's Exh. 97 at CUMIS 14989, 14991; Defendant's Exh. 98 at CUMIS 15033; Defendant's Exh. 99 at CUMIS 15051.)  A share-secured loan is a type of loan that is secured by funds in the borrower's or guarantor's savings or share certificate account.  In theory, the subject funds are to be "frozen" or "held" in the amount of the share-secured loan, and made available in the event loan payments are not made.  By their very nature, share-secured loans are considered to be "safe and secure" because they are collateralized by funds on deposit at the credit union. (Calevich Test. at Tr. 505; Dawe Test. at Tr. 346-347; Raguz Test. at Tr. 145.)

7.   Certain types of loans were supposed to be brought to the St. Paul Board for discussion.  An undated, unsigned document entitled "St. Paul Croatian Federal Credit Union Loan Policies" states that "[a]ll loan requests over the amount of $25,000" were to be brought before the Board for discussion.  (Defendant's Exh. 7.)  Calevich testified, however, that this Loan Policy was very dated and not accurate "in practice."  (Calevich Test. at Tr. 505-506, 519-520.)  Calevich explained that real estate loans over a certain amount had to be brought to the Board because of their "riskier nature," but neither car loans nor share-secured loans were required to be brought to the Board's attention.  (Calevich Test. at Tr. 506.)  The Court finds Calevich's testimony to be credible on this point.

8.   During the time period that Plavac was manager of St. Paul (i.e., 1986 to 1995), there were delinquencies "each and every month and year at St. Paul," at a rate of one to two percent. (Plavac Test. at Tr. 546-547.)  The delinquency rate continued at the same approximate rate of 1 to 2% during the time period Raguz was manager of St. Paul; i.e., 1995 to 2001.  *Id.*  Calevich also recalled that, during the time period that he was treasurer (1998 to 2005), there were reportable delinquencies at St. Paul.  (Calevich Test. at Tr. 496.)

**B.    Raguz's Fraudulent Scheme**

9.   At some point during 2000, Raguz started making fraudulent loans; i.e., accepting

bribes in exchange for authorizing loans.  (Raguz Test. at Tr. 147-148.)  After the first fraudulent loan was made, "it slowly grew into more."  (Raguz Test. at  Tr. 148.)  Between 2000 and 2010, Raguz accepted approximately $1 million in bribes in exchange for making loans.  (Raguz Test. at Tr. 153.)

10.  Raguz was very concerned about concealing his fraud.  To avoid discovery, Raguz decided to focus his fraudulent activity on share-secured loans "because they didn't have to be reported to the Board for approval and they were looked upon very lightly by both auditors and federal examiners."  (Raguz Test. at Tr. 147, 160-161.)  Raguz manipulated these loans by coding them as shared-secured loans, but "they were not actually share-secured."  (Raguz Test. at Tr. 147.)

11.  Raguz attempted to conceal his fraud by manipulating St. Paul's delinquency rate.  (Raguz Test. at Tr. 158.)  Throughout the entire time Raguz was running St. Paul, there were actual, reportable delinquencies.  (Raguz Test. at Tr. 187.)  However, beginning in 2002 and continuing until 2010, Raguz simply started reporting no delinquencies.   (Raguz Test. at Tr. 187-188.)  Specifically, and as described in more detail below, Raguz employed several practices to avoid reporting any loans as delinquent since he believed delinquent loans would draw the attention of the Board of Directors, Supervisory Committee, federal examiners, and St. Paul's internal auditor.  (Raguz Test. at Tr. 158-159.)

12.  One of the practices Raguz employed to conceal his fraud was a process he called "resetting" loans.  (Raguz Test. at Tr. 148.)  As explained by Raguz, "[t]hat meant that when the loans hit 90 day late status, we rolled over the principal and interest, resetting the note into a new loan; therefore, keeping it off the delinquency list and off the charge-off list."  (Raguz Test. at Tr. 148-149.)  This process was similar to refinancing a loan.  (Raguz Test. at Tr. 149.)

13.  Another practice used by Raguz to conceal his fraud was "covering" loans.  This practice involved "creat[ing] some bogus loans, made-up loans and us[ing] those monies to fund loan payments in all these bad loans."  (Raguz Test. at Tr. 154.)

14.  Finally, Raguz "burned" loans to conceal his fraud.  (Raguz Test. at Tr. 155.)  "Burning" loans involved using cover money to pay off a loan and, thereby, take it "off the

6

books." *Id.*  This practice was more commonly used to get smaller loans off the delinquency list.
*Id.*

15.  Raguz's fraudulent scheme went on for roughly a decade, i.e., from 2000 to 2010.
(Raguz Test. at Tr. 155.)

16.  During this time period, St. Paul reported tremendous asset growth.  As of December
2001, St. Paul had total assets of $52 million and a loan portfolio of $42 million.  (Plaintiff's
Exh. D at 000004; Defendant's Exh. 1 at CUMIS013303)  By March 2010, St. Paul reported
total assets of $250 million and a loan portfolio of $240 million.  *Id.*

17.  As noted above, St. Paul's loan portfolio consisted a mix of loan types, including
credit card, real estate, vehicle, and share-secured loans.  As of December 2007, St. Paul
reported balances of $2 million in credit card loans; $31 million in real estate loans; $2 million in
new and used vehicle loans; and $131.2 million in share-secured (or pledged) loans.
(Defendant's Exh. 98 at CUMIS 15032-15033.)  As of December 2008, St. Paul reported
balances of $1.9 million in credit card loans; $42 million in real estate loans; $1.7 million in new
and used vehicle loans; and, $135 million in share-secured loans.  (Defendant's Exh. 99 at
CUMIS 15051,15053.)

18.  Annual Meetings of the credit union were conducted between 2005 and 2009 during
which members (including Board members) were provided information regarding St. Paul's
finances.  Reports from these meetings consistently reflected significant, sustained growth in St.
Paul's assets, loan portfolios, and total member's equity.[5]  (Defendant's Exhibits 1- 6.)

------

[5] Specifically, the Annual Meeting reports reflected the following: (1) for the year 2004,
total assets of $119 million, loans in the amount of $110.6 million, and total member's equity of
$108.7 million (Defendant's Exh. 1 at CUMIS 13301, 13303); (2) for the year 2005, total assets
of $144 million, loans in the amount of $135.5 million, and total member's equity of $130
million (Defendant's Exh. 2 at CUMIS 13287, 13289); (3) for the year 2006, total assets of $161
million, loans in the amount of $154.7 million, and total member's equity of $139.4 million
(Defendant's Exh. 3 at CUMIS 13274, 13276); (4) for the year 2007, total assets of $171 million,
loans in the amount of $164.7 million, and total member's equity of $147 million (Defendant's
Exh. 4 at CUMIS 132264, 13266); (5) for the year 2008, total assets of $195.8 million, loans in
the amount of $189.6 million, and total member's equity of $169.9 million (Defendant's Exh. 5
at CUMIS 13254, 13256); and (6) for the year 2009, total assets of $238.8 million, loans in the

19.   In addition, the St. Paul Board conducted regular monthly meetings between January 2005 and January 2010.  Calevich was present at virtually all of these meetings.[6]  The Minutes indicate that, at each of these meetings, the Board was provided financial reports stating that St. Paul had a zero delinquency rate.  (Defendant's Exhs. 8-74.)  These financial reports were prepared by Raguz.  (Raguz Test. at Tr. 188.)

20.   Raguz also prepared financial reports regarding St. Paul that were provided to federal examiners.  During the relevant time period, these reports consistently represented (among other things) that St. Paul had a zero delinquency rate.  (Raguz Test. at Tr. 156; Defendant's Exh. 97 at CUMIS 14989; Defendant's Exh. 98 at CUMIS 15031-15032; Defendant's Exh. 99 at CUMIS 15050-15151.)

21.   In preparing these financial reports (for both the Board and federal examiners), Raguz falsely reported that St. Paul had zero reportable delinquencies.  As set forth above, Raguz misrepresented St. Paul's delinquency rate for the express purpose of concealing his fraudulent scheme. (Raguz. Test. at Tr. 158-159, 187.)

22.   At some point, the Board became concerned regarding St. Paul's tremendous growth, in particular the expansion of St. Paul's loan portfolio.  (Calevich Test. at Tr. 486.)  The Board asked Raguz for a breakout of each loan he was making, whether it was share-secured or otherwise.  *Id.*  Raguz refused to provide this information, and the Board did nothing to discipline him.  (Calevich Test. at Tr. 486-487.)

23.  The Board also became concerned about the zero delinquency rate.  (Calevich Test. at Tr. 496.)  In particular, Calevich knew, based on his own experience as a Board member, that there had to be at least some delinquencies.  (Calevich Test. at Tr. 496-497.)  The Board raised

---

amount of $231.7 million and total member's equity of $208.5 million (Defendant's Exh. 6 at CUMIS 13244, 13246).

[6] According to a review of the monthly meeting minutes submitted into evidence, Calevich was present at all but three (3) of the monthly meetings between January 2005 and January 2010.  Plavac was present at all but five (5) of these meetings.  (Defendant's Exhs. 8 through 74.)

this issue with Raguz "from time to time," but never got a straight answer.  (Calevich Test. at Tr. 497.)

**C.**  <u>**Federal Examinations and Internal Audits**</u>

24.  At all relevant times, St. Paul was a federally regulated and insured credit union. (Stipulated Findings of Fact at ¶ 2.)

25.  In its regulatory capacity, the National Credit Union Administration (hereinafter "NCUA" or "the Agency") conducted periodic examinations of St. Paul from 2004 to 2009, at which time NCUA examiners visited St. Paul and reviewed its records.  (Stipulated Findings of Fact at ¶ 3.)

26.  The NCUA thereafter prepared Examination Reports setting forth its analysis of "major risk areas" in St. Paul operations, as well as findings regarding St. Paul's financial condition, the quality of its management, and the "risk of loss to member capital and the National Credit Union Share Insurance Fund."  (Defendant's Exhs. 97 at CUMIS 14977; Exh. 98 at CUMIS 14999; and Exh. 99 at CUMIS 15038.)

27.  NCUA Examination Reports confirm that St. Paul consistently reported a zero delinquency rate to federal examiners during the time period 2003 through 2008.  (Defendant's Exh. 97 at CUMIS 14981, 14984-14985; Exh. 98 at CUMIS 15003; Exh. 99 at CUMIS 15045-15046, 15050.)

28.  Examination Reports for the calendar years 2007 and 2008 found St. Paul had a composite CAMEL[7] rating of 2.  (Dawe Test. at Tr. 330-332; Defendant's Exh. 98 at CUMIS

---

[7] The CAMEL rating system is based upon an evaluation of five critical elements of a credit union's operations: Capital Adequacy; Asset Quality; Management; Earnings; and, Liquidity.  (Dawe Test. at Tr. 331; Defendant Exh. 98 at CUMIS 15000.)  For each of these five components, the NCUA assigns a grade between 1 to 5, with 1 being the best and 5 being the worst.  (Dawe Test. at Tr. 331.)  The NCUA also assigns an overall CAMEL rating, which is a composite of the five components.  (Dawe Test. at Tr. 333-334.)  One of the five CAMEL elements, Asset Quality, pertains to the examiners' review of the credit union's loan portfolio. (Dawe Test. at Tr. 332.)  In 2007 and 2008, St. Paul got a CAMEL score of 1 with respect to its Asset Quality.  *Id.*

9

15008; Defendant's Exh. 99 at CUMIS 15040.)  A composite CAMEL 2 rating indicates that the NCUA considers a credit union to be "financially sound," and is generally considered to be an excellent rating.  (Defendant's Exh. 99 at CUMIS 15040; Dawe Test. at Tr. 330-332.)

29.  The NCUA's Examination Reports were provided to the St. Paul Board and Supervisory Committee.  (Stipulated Findings of Fact at ¶ 4.)

30.  St. Paul also engaged an outside auditor, George Hanks, to perform yearly audits. (Stipulated Findings of Fact at ¶ 5.)  Mr. Hanks' audits were provided to the Supervisory Committee, which would review them and report back to the Board.  (Calevich Test. at  Tr. 507-508; Stipulated Findings of Fact at ¶ 6.)  None of Mr. Hanks' audits revealed Mr. Raguz's fraud. (Dawe Test. at Tr. 336-337.)

**D.    <u>Fidelity Bond</u>**

31.  Throughout the relevant time period, Defendant was St. Paul's fidelity insurer. (Stipulated Findings of Fact at ¶ 7.)  The fidelity bond at issue herein became effective on February 10, 2010 and was "continuous until cancelled."  (Plaintiff's Exh. B. at 006.)  This bond (hereinafter referred to as "the 2010 Bond") provided up to $5 million in coverage for employee or director dishonesty.  (Plaintiff's Exh. B at 007, 020.)

32.  Raguz was the individual at St. Paul that completed the CUMIS applications for fidelity bond renewals.  (Stipulated Findings of Fact at ¶ 8.)  Raguz executed the applications and renewals for St. Paul's fidelity bonds from at least 2004 to 2010.  (Stipulated Findings of Fact at ¶ 9.)

33.  Each year since at least 2004, Raguz lied by denying knowledge of fraud when completing the CUMIS bond applications and renewals.

34.  Sometime in early 2010, the NCUA began to have concerns regarding St. Paul's operations.  On April 23, 2010, the NCUA Board placed St. Paul into conservatorship pursuant to 12 U.S.C. § 1786(h)(1), naming itself as Conservator.  (Plaintiff's Exh. A; Stipulated Findings of Fact at ¶15.)

35.  One week later, on April 30, 2010, the NCUA Board placed St. Paul into involuntary liquidation due to insolvency and appointed itself the Liquidating Agent pursuant to 12 U.S.C. §

10

1787(a)(1)(A).  (Stipulated Findings of Fact at ¶ 16.)

36.  Plaintiff retained an accounting firm, Lillie & Company, to prepare a forensic report, and assist in the filing of a proof of loss under the Bond.  (Murphy Test. at Tr. 49-51.)

37.  On October 8, 2010, Plaintiff filed a Proof of Loss with Defendant in the amount of $72,546,823.72.  (Stipulated Findings of Fact at ¶ 17.)  Defendant thereafter denied the claim.

### III.  Analysis & Conclusions of Law

Plaintiff argues the testimony and evidence presented at trial proves it is entitled to $5 million in employee dishonesty coverage for losses caused by Raguz's fraudulent scheme.[8]  The 2010 Bond provides coverage for "Employee or Director Dishonesty" as follows:

**A.      Employee Or Director Dishonesty**

> We will pay you for your loss resulting directly from dishonest acts committed by an "employee" or "director," acting alone or in collusion with others.
>
> Such dishonest acts must be committed by the "employee" or "director" with the intent to:
>
> a. Cause you to sustain such loss; or
>
> b. Obtain an improper financial benefit for the "employee," "director," or for any other person or entity.
>
> However, if some or all of your loss resulted directly or indirectly from a "loan" or "trade," that portion of the loss is not covered unless you establish that the portion of the loss involving a "loan" or "trade" resulted directly from dishonest acts committed by the "employee" or "director," acting alone or in collusion with others, with the intent to:
>
> > 1) Cause you to sustain such loss; and
> >
> > 2) Obtain an improper financial benefit for the "employee" or "director," or a financial benefit for any other person or entity.

(Plaintiff's Exh. B. at 020.)  The term "employee" is defined, in relevant part, as: "persons who were, are, or may be in the future, acting under your immediate direction and control in the

---

[8]  Plaintiff also claims it is entitled to $50,000 in auditing expenses associated with the preparation of Proof of Loss prepared by Lillie & Company.  The Bond at issue herein provides that: "We will pay you for the necessary and reasonable fees and expenses you pay for a special audit of your records.  Such audit must establish a valid and collectible loss under the Employee or Director Dishonesty Coverage. . ."  *See* Plaintiff's Exh. B at 027.

conduct of your business and while in the course and scope of performance of their assigned duties; and (a) Are paid a regular wage or salary by you or by an employment services that provides such persons to you." *Id.* at 039.

By its terms, the 2010 Bond applies to "loss discovered by you while this Bond is in effect." *Id.* at 070. As noted *supra*, the 2010 Bond became effective on February 11, 2010 and was "continuous until canceled." *Id.* at 006. The Bond's Discovery of Loss provision further states as follows:

> Discovery occurs when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered under this Bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred. The exact amount or details of the loss may not be known at the time of discovery.

*Id.* at 070. Written notice must then be sent "at the earliest practicable moment after Discovery of Loss, but not to exceed 60 days after such discovery, without regard to amount or whether the loss appears to exceed the deductible." *Id.* A complete, sworn Proof of Loss must thereafter be submitted "[w]ithin 180 days after notice of Discovery of Loss." *Id.* Finally, legal proceedings to recover loss under the Bond "[m]ust be brought within two years after Discovery of Loss." *Id.* at 073.

Plaintiff maintains that "[e]very element of the Employee Dishonesty claim has been established such that CUMIS is required to pay the $5 million limits afforded for same under the Bond: a) **discovery** of the loss occurred during the Bond's effective policy term; b) Raguz was an **'employee'** as defined by the Bond; c) Raguz directly **caused** the loss due to his fraudulent activities of which he was convicted and subjected to in excess of $70 million in restitution; d) Raguz caused the harm with the knowledge he was causing harm such as to satisfy **intent** and he did so to obtain improper benefit; [and] e) **notice** of loss occurred within 5 days of discovery, well within the 60 day limit and the Proof of Loss was submitted within 180 days, as required under the Bond." (Doc. No. 191 at 6) (emphasis in original).

Defendant attacks Plaintiff's arguments with respect to virtually all of these elements. First, Defendant maintains Raguz abdicated his status as an "employee" under the 2010 Bond, citing testimony that Raguz refused to respond to the Board's requests for information regarding

12

St. Paul's share-secured loans and purported zero delinquency rate. (Trial Tr at 807.) Defendant next asserts Plaintiff failed to come forward with admissible evidence documenting $5 million in compensable losses under the Bond.[9] Defendant also claims Plaintiff failed to introduce any evidence at trial that it timely submitted written notice within 60 days of discovery of the loss. (Trial Tr. at 811-812.)

Defendant's primary arguments, however, relate to the Bond's Termination and Discovery of Loss provisions. With respect to Termination, Defendant asserts that coverage for Raguz terminated before the inception of the 2010 Bond because Calevich knew Raguz committed dishonest acts by repeatedly failing to disclose reportable delinquencies to the Board and the NCUA. (Doc. No. 192 at 2-5.) In support of this argument, Defendant relies primarily on Calevich's trial testimony that (1) he "knew in fact there had to be at least some delinquencies" based on his own experience as a Board Member; (2) the Board had concerns about the allegedly zero delinquency rate; (3) the Board raised this issue with Raguz from time to time; and, (4) Raguz never provided a "solid answer" in response to the Board's questions. (Doc. No. 192 at 4, citing Trial Tr. 496-497.)

---

[9]Specifically, Defendant asserts Plaintiff failed to introduce admissible evidence regarding the specific loans on which the claim for $5 million is based. At trial, Plaintiff relied on the forensic accounting report prepared by Lillie & Company (hereinafter the "Lillie Report") as evidence of the loans forming the basis of the claim. Defendant objected on the basis that the Lillie Report constituted hearsay, noting Plaintiff failed to call any of the actual preparers of the Report as trial witnesses. (Trial Tr. at 53-54.) Plaintiff instead sought to introduce the information contained in the Lillie Report through the testimony of Elizabeth Martin, a liquidation analyst employed by Plaintiff to verify the accuracy of the loss calculations contained in the Lillie Report. Defendant objected to Plaintiff's reliance on Ms. Martin's testimony on the grounds that (1) Plaintiff had failed to timely disclose relevant documents prepared by Ms. Martin regarding her analysis of the losses outlined in the Lillie Report; and, (2) Ms. Martin was, in fact, testifying as an expert witness but had not been disclosed as such as required by Fed. R. Civ. P. 26. (Trial Tr. at 117-123, 252-256, 780-781, 785.) After Ms. Martin's testimony, Defendant further objected to admission of the Lillie Report on the ground that it constituted an expert report and was, therefore, inadmissible. (Trial Tr. at 780-782.) For these reasons, Defendant objected to the admission of the Lillie Report; moved to strike Ms. Martin's testimony; and moved for a mistrial. (Trial Tr. at 239-242.) For the reasons stated on the record, the Court denied Defendant's motions to strike and for mistrial, and admitted the Lillie Report into evidence. (Trial Tr. at 757-758, 785.)

With respect to Discovery of Loss, Defendant argues Plaintiff's alleged loss is not covered because the loss was discovered "well before" the Bond's February 2010 effective date. Specifically, Defendant asserts "the Board discovered the loss no later than 2008 when it had learned of five critical facts: (1) none of the funds allegedly backing over $100M in shared-secured loans were frozen;[10] (2) St. Paul had issued approximately $8.7M more in allegedly share-secured loans than it had shares on deposit; (3) Raguz had reported zero delinquencies on all loans (no matter the type) since 2002; (4) during the period of 2005-2009, over $120M in loans were issued, but only slightly more than $3M were reviewed by the Board; and (5) Raguz failed to respond to the Board's repeated inquiries concerning the zero delinquencies, the volume of loans, and the names of the share-secured borrowers and the amount of each loan." *Id*. at 5-6.  Defendant also claims, in passing, that each of these "five critical facts" likewise establishes termination of coverage for Raguz prior to the inception of the February 2010 Bond.  (Doc. No. 192 at 5, fn 4.)

Because it is determinative of the instant action, the Court begins (and ends) with Defendant's argument regarding the 2010 Bond's Termination provision, i.e., that coverage for Raguz terminated prior to the inception of the 2010 Bond because at least one Board member (Calevich) knew Raguz had falsely reported zero delinquency rates to both the Board and the NCUA for many years.  The Termination provision of the 2010 Bond states, in relevant part, as follows:

**9.      Termination Or Limitation Of Coverage For Employee Or**

---

[10]  This information was contained in the December 31, 2007 NCUA Examination Report, which stated (among other things) as follows: "When asked to see the hold on members account in the computer system, it was discovered that the deposits are not shown as being pledged to a loan.  No funds were shown as being held."  (Defendant's Exh. 98 at CUMIS 015006.)  The NCUA indicated that this issue, along with the fact that St. Paul had approximately $8.7 million more in share-secured loans than it had shares on deposit, "needs to be investigated and corrected."  *Id*. at CUMIS 015007.  The Court notes in passing that, had the NCUA itself investigated this issue, it might have uncovered Raguz's fraud.  Specifically, if the NCUA traced the funds and found even one account where the loan file indicated that funds had been pledged but, in fact, the use of the account as security had not been authorized by the account holder, the NCUA would have uncovered the heart of Raguz's fraudulent scheme.

14

**Director**

1.  **This Bond's coverage for an "employee" or "director"
    terminates immediately when one of your "directors," officers
    or supervisory staff not in collusion with such person learns
    of:**

    a.  **Any dishonest or fraudulent act committed by such
        "employee" or "director" at any time, whether or not
        related to your activities or of the type covered under
        this Bond**;

    * * *

3.  Termination of coverage for an "employee" or "director" under
    paragraphs 1. or 2. above terminates our liability for any loss
    resulting from any act or omission by that "employee" or
    "director" occurring after the effective date of such termination.

(Plaintiff's Exh. B. at 069-070) (emphasis added). Thus, in order to demonstrate that coverage
for Raguz terminated under this provision, Defendant herein must show that: (1) a director,
officer, or supervisory staff member of St. Paul; (2) not in collusion with Raguz; (3) learned of;
(4) "any dishonest or fraudulent act" committed by Raguz, "whether or not related to your
activities or of the type covered under this Bond." Moreover, in order to avoid liability for the
claimed loss in the instant case, Defendant must show that these elements were met prior to the
February 10, 2010 effective date of the Bond.

Plaintiff argues, summarily, that Defendant failed to prove the first element; i.e., that
Calevich constituted a director, officer, or supervisory staff member of St. Paul. Plaintiff does
not explain this argument, and the Court rejects it. The Bond defines "director" as "a person
elected or appointed to your Board of Directors according to your charter or bylaws and the laws
under which the charter is issued." (Plaintiff's Exh. B. at 038.) Here, Calevich expressly
testified he was elected to the St. Paul Board of Directors in 1988, and served on the Board
continuously until St. Paul was liquidated in April 2010. (Calevich Test. at Tr. 465-466.)
Indeed, Calevich testified he was elected secretary/treasurer in 1995 or 1996, and was thereafter
elected president of the St. Paul Board in March 2005. *Id.* at Tr. 467. The Court finds this
testimony sufficient to demonstrate that, throughout the relevant time period, Calevich was a
"director" of St. Paul, as that term is defined in the 2010 Bond.

15

Plaintiff next argues Defendant failed to prove that Calevich learned of a "dishonest act" committed by Raguz.[11]  The term "dishonest act" is not defined in the 2010 Bond.  At the request of the Court, the parties submitted proposed definitions of this term.[12]  (Doc. Nos. 115, 116, 117, 120.)  Plaintiff proposes the following two definitions:

(1) "wrongful acts committed with knowledge that they may trigger coverage under CUMIS'[s] Bond;" or

(2) "conduct with the specific purpose, object, or desire both to cause a loss and obtain a financial benefit."

(Doc. No. 116 at 5.)[13]

In support of these proposed definitions, Plaintiff notes that "the bond itself defines dishonesty to include an intent element."  *Id*. at 6.  Plaintiff then quotes the employee or director dishonesty clause of the 2010 Bond, which (as noted above) provides that: "[w]e will pay you for your loss resulting directly from dishonest acts committed by an 'employee' or 'director,' acting alone or in collusion with others.  Such dishonest acts must be committed by the 'employee' or 'director' with the intent to: cause you to sustain such loss; or obtain an improper financial benefit for the 'employee,' 'director,' or for any other person or entity."  (Plaintiff's Exh. B. at 020)

Defendant objects to both of Plaintiff's proposed definitions.  With regard to the first, Defendant maintains this definition "contradicts the explicit language of the bond because the

---

[11] Plaintiff does not contend that Calevich was "in collusion" with Raguz.

[12]  The Court also requested that the parties submit proposed definitions of the terms "supervisory staff" and "in collusion."  In light of the Court's ruling in this matter, it is not necessary to reach the issue of the appropriate definitions of these terms.

[13] Plaintiff objects in general to "the requirement to define ambiguous terms in the bond that CUMIS issued to St. Paul . . . , such that may result in excluding coverage, as said requirement conflicts with long-standing precedent."  (Doc. No. 116 at 1.)  Defendant argues, and the Court agrees, that the term "dishonest act" was never found to be ambiguous.  Rather, the Court simply recognized that this term was not defined in the 2010 Bond and asked the parties to brief the issue of an appropriate definition for purposes of trial.  *See* Doc. No. 111 at 9-10.

bond's termination provision specifically includes dishonest or fraudulent acts whether or not the acts trigger coverage."  (Doc. No. 117 at 4.)  The Court agrees with Defendant.  The Termination provision expressly provides that coverage is terminated when a director learns of any dishonest act "whether or not related to your activities or of the type covered under this Bond."  (Plaintiff's Exh. B at 069)  Thus, the Court rejects Plaintiff's first proposed definition.

With respect to Plaintiff's second proposed definition, Defendant argues this definition "does not work because it is also limited to acts committed with an intent to cause a loss to the credit union and obtain a benefit.  That is the test for coverage, not a definition of 'dishonest conduct.'" (Doc. No. 117 at 3.)

Again, the Court agrees with Defendant.  The primary case cited by Plaintiff in support of its proposed definition, *Resolution Trust Corp v. Fid. & Deposit Co. of Maryland*, 205 F.3d 615, 642 (3rd Cir. 2000), deals with the definition of the term "manifest intent" in the context of determining coverage under an employee dishonesty clause.  That discussion, as Defendant correctly notes, relates to the issue of what conduct is covered under the employee or director dishonesty clause of the bond, and not to the definition of the discrete term "dishonest act" as used in the Termination provision in the 2010 Bond at issue herein.[14]  In other words, the Court

---

[14]In *Resolution Trust*, the Third Circuit interpreted the elements of a fidelity bond's employee dishonesty clause as follows: "Broken down into its components, this provision requires that the following elements be present in order for a loss to constitute a covered event: (1) the insured must incur a loss; (2) the loss must have 'result[ed] directly' from dishonest or fraudulent acts of an employee or employees; (3) the employee must have committed the acts with the 'manifest intent' to cause the insured to suffer the loss sustained (which we call 'subsection (a)'s requirement'); and (4) the employee must have committed the acts with the 'manifest intent' to obtain a financial benefit for the employee or a third party, and the financial benefit obtained must not be of the type covered by the exclusionary clause (which we call 'subsection (b)'s requirement')." *Resolution Trust*, 205 F.3d at 636.  The Third Circuit then examined case law regarding the definition of the term "manifest intent" as used in that clause.  After a lengthy discussion of this issue, that Court held that the term "manifest intent" requires the insured to "prove that the employee engaged in dishonest or fraudulent acts with the specific purpose, object or desire both to cause a loss and obtain a financial benefit." *Id*. at 642.  Although not relevant to the instant case, the Court notes, in passing, that the Sixth Circuit has adopted a different definition of the term "manifest intent."  In the Sixth Circuit, the term "manifest intent" "does not establish a subjective standard; it establishes an objective one,

17

finds Plaintiff's definition is not persuasive because it relies on case law interpreting a different term ("manifest intent") in a different clause (an employee or director dishonesty clause) relating to a different issue (coverage) than that presented in the instant case.[15]

In its Proposed Definitions, Defendant maintains the terms "dishonest" and "fraudulent" (as used in a fidelity bond) have been interpreted broadly to encompass acts "which show a want of integrity or breach of trust."  (Doc. No. 115 at 4-5.)  The Court agrees.  Indeed, this Court has found at least one case in which a federal district court approved this interpretation of the terms "dishonest or fraudulent act" in the context of a termination provision very similar to the one at issue herein.  In *Resolution Trust Corp. v. Aetna Cas. & Sur. Co.*, 873 F.Supp. 1386, 1392 (D. Ariz. 1994), the district court cited with approval another case that held as follows:

> [t]he terms 'dishonest' and 'fraudulent' as used in fidelity bonds have a broad meaning.  They include acts which show a 'want of integrity' or 'breach of trust.'  They also include acts in disregard of an employer's interest, which are likely to subject the employer to loss.  The fact that one knowingly makes unauthorized loans in excess of authority has been called 'such a breach of trust as will constitute fraud or dishonesty within the meaning of the law.'

*Id.* at 1392 (citing with approval *FDIC v. National Surety Corp.*, 281 N.W.2d 816 (Iowa 1979)). In *Aetna*, the district court found that a bank president's act of authorizing an illegal loan and misrepresenting to board members how a loan would be handled constituted "dishonest or fraudulent" acts under a fidelity bond's termination provision.  *Id.* at 1391 ("Lempke and Johnston's testimony establishes that they knew that Beck had knowingly authorized an illegal loan and, in their view, had not told the truth to them about how the loan would be handled. This is enough to implicate the termination provision.")

Several other courts have also similarly interpreted the terms "dishonest or fraudulent act," although not always in the context of a termination provision.  For example, the Seventh

---

meaning 'apparent or obvious.' . . . An insured meets the requirement where 'a particular result is substantially certain to follow from conduct.'" *First Defiance Financial Corp. v. Progressive Cas. Ins. Co.*, 688 F.3d 265, 271 (6th Cir. 2012).

[15] There is no dispute in the instant case that Raguz acted with the requisite intent to cause St. Paul's losses.

Circuit interpreted these terms broadly in determining conduct that is covered under a fidelity bond:

> The words "dishonest" and "fraudulent" used with reference to conduct covered by a fidelity bond are to be given a broad meaning. *Citizens State Bank v. Transamerica Insurance Company*, 452 F.2d 199, 203 (7th Cir. 1971); *Elgin National Bank v. Home Indemnity Co.*, 583 F.2d 1281 (5th Cir. 1978). **Their connotation is broader and more comprehensive than the word " criminal" ; and they include acts which show a want of integrity or breach of trust.** *Arlington Trust Co. v. Hawkeye-Security Insurance Co.*, 301 F.Supp. 854, 857-858 (E.D.Va.1969). Conduct may be fraudulent and dishonest within the meaning of a banker's blanket bond even though it falls short of a criminal offense. *First National Bank of Sikeston v. Transamerica Insurance Co.*, 514 F.2d 981, 987 (8th Cir. 1975).
>
> Thus it has been held that where a bank employee creates a conflict of interest, looks after his own benefit, or acts in disregard of his employer's interests, subjecting the employer to a likelihood of loss, he is acting fraudulently and dishonestly within the meaning of a fidelity bond. *Boston Securities, Inc. v. United Bonding Insurance Co.*, 441 F.2d 1302, 1304 (8th Cir. 1971). A bank's assistant vice-president, in charge of an installment loan department, who approves a customer loan which exceeds authorized limits, and permits the customer to use names of other individuals as borrowers, commits a dishonest and fraudulent act within the meaning of the banker's blanket bond. *Miami National Bank v. Pennsylvania Insurance Co.*, 314 F.Supp. 858 (S.D.Fla.1970). **Both misrepresentation of facts and deliberate deception by pretense and stealth constitute dishonest and fraudulent conduct within the terms of a fidelity bond to a bank.** *Federal Deposit Insurance Corp. v. Aetna Casualty & Surety Co.*, 426 F.2d 729 (5th Cir. 1970). So, it goes without saying that it is dishonest for the president of a bank to secretly obtain its funds by putting forth others as being worthy of credit. *Maryland Casualty Co. v. American Trust Co.*, 71 F.2d 137, 138 (5th Cir. 1934); *See Arlington Trust Co. v. Hawkeye-Security Insurance Co., supra.*

*First Nat. Bank Co. of Clinton, Ill. v. Insurance Co. of North America*, 606 F.2d 760, 768-769 (7th Cir. 1979) (emphasis added). *See also City Loan & Sav. Co. v. Employers' Liability Assur. Corp.*, 249 F.Supp. 633, 656 (N.D. Ohio 1964) (Battisti, J.) ("To constitute dishonesty, the conduct need not amount to a crime and need only involve bad faith or a want of integrity or untrustworthiness or a disposition to lie or cheat or a faithlessness to a trust."); *FDIC v. CNA Cas. of Puerto Rico*, 786 F.Supp. 1082, 1087 (D. Puerto Rico 1991) ("The words 'fraud or dishonesty' when used with reference to conduct covered by a fidelity bond, are given a broad meaning. The words have been deemed to include any act showing a lack of integrity; a breach of trust; or an abstraction of funds together with deceit and concealment.")

Based on the above, the Court rejects Plaintiff's proposed definitions of the term

19

"dishonest act."  Rather, and as discussed during the last day of bench trial (Trial Tr. at 800-801), the Court finds the term "dishonest act" should be construed broadly and consistent with its plain and ordinary meaning to encompass conduct that shows a want of integrity or breach of trust.

In the instant case, the testimony and evidence introduced at trial shows the following. Raguz prepared financial reports that were submitted to the St. Paul Board and reviewed as part of the Board's monthly meetings.  (Raguz Test. at Tr. 188; Defendant's Exhs. 8 - 74.)  In every financial report submitted by Raguz to the Board for monthly meetings occurring between January 2005 and January 2010, St. Paul's delinquency rate was reported as zero.  (Defendant's Exhs. 8 - 74.)  Raguz also prepared and submitted financial reports regarding St. Paul to NCUA examiners on a quarterly basis.  (Raguz Test. at Tr. 156.)  From at least 2003 through 2008, these reports represented that St. Paul had a zero delinquency rate. (Defendant's Exh. 97 at CUMIS 14981, 14984-14985; Exh. 98 at CUMIS 15003; Exh. 99 at CUMIS 15045-15046, 15050.)  This purported zero delinquency rate applied to the entire spectrum of loans offered by St. Paul, including real estate loans, credit card loans, unsecured loans, and share-secured loans.

Raguz testified that, throughout this entire time period, there were, in fact, actual reportable delinquencies at St. Paul.  (Raguz Test. at Tr. 187.)  Raguz falsely reported zero delinquencies, however, because he believed delinquent loans would draw the attention of the Board, Supervisory Committee, federal examiners, and Mr. Hanks.  He believed this increased scrutiny would ultimately reveal his fraudulent scheme.  (Raguz Test. at Tr. 158-159.)  The Court finds Raguz's testimony on these issues to be credible.

Based on the above, the Court finds that, over a span of at least five years (2005 to 2010), Raguz reported to the Board that St. Paul had a zero delinquency rate when, in fact, he knew that there were actual, reportable delinquencies at St. Paul.  The Court further finds that, from at least 2003 to 2008, Raguz made similar false reports to federal examiners that St. Paul had a zero delinquency rate.

Courts have found that the submission of false financial information (either to an institution's directors or officers and/or to state or federal examiners) may constitute a

20

"dishonest" or "fraudulent act" for purposes of a fidelity bond. *See e.g. Midland Bank & Trust Co. v. Fidelity & Deposit Co. of Maryland*, 442 F.Supp. 960, 971 (D. N.J. 1977) (finding that "knowingly making false reports, both oral and written, to not only their fellow Bank Directors, but also the New Jersey Banking Department, certainly constitutes conduct which displays a significant lack of probity, integrity and trustworthiness"); *Arlington Trust Co . v. Hawkeye-Security Ins. Co.*, 301 F.Supp. 854, 858 (E.D. Va. 1969) (finding that employee's act of knowingly making false reports– both written and oral– to his superiors constituted a dishonest act under fidelity bond); *City Loan & Sav. Co. v. Employers' Liability Assur. Corp., Ltd.*, 249 F. Supp. 633, 656 (N.D. Ohio 1964) ("The fact that Lonsway lied as to each challenged account being a genuine and justifiable good account before Herman admitted they were falsified, [and] the fact that Lonsway had knowingly permitted falsified documents and values to be the basis of the disbursement of City Loan funds, . . . were all facts admittedly known to the officers of City Loan and were all specific acts of dishonesty.")

Plaintiff, however, argues it was not "dishonest" for Raguz to report a zero delinquency rate.  (Doc. No. 191at 2-3.)  Specifically, Plaintiff asserts as follows:

> [T]he Court inquired whether it was "dishonest" for Raguz to report zero-delinquencies. The short answer is no - there were no "reportable" delinquencies because Raguz' fraudulent loan scheme ensured same, i.e. by authorizing fraudulent share-secured loans to reset, cover and burn "non-reportable" delinquent loans prior to them becoming "reportable."
>
> The more lengthy explanation is that [St. Paul] had delinquencies, but they were simply "non-reportable." [Plaintiff's expert Christine Dawe] testified that there were $804,000 "non-reportable" delinquencies in 2008 as evidenced on the Call Report.  Delinquencies are distinguished between those merely on the Call Report, i.e. "non-reportable", and those that make it to the "delinquency ratio," i.e. "reportable."  Calevich further described "reportable" delinquencies as: "[w]hen a borrower is two months behind in his payments, it becomes reportable to the Board.  Further, several persons testified that share-secured loan delinquencies can legitimately be cured prior to them becoming "reportable." This practice was common in the industry. NCUA Exam Reports reflect this.
>
> * * *
>
> **So at the end of the day, there were "non-reportable" delinquencies of which those that reviewed the Call Reports were aware.  Everyone was under the incorrect assumption that Raguz was legitimately curing the "non-reportable" delinquencies before they became "reportable," when in fact, he was not.  Rather, he cured them by authorizing share-secured loans that were fraudulent, i.e. they were not fully or properly collateralized.**

21

> **Hence there was no dishonesty in Raguz factually reporting zero-delinquency. The dishonesty was that Raguz fraudulently loaned money under the guise of being share-secured, which is also the heart of the case and the cause of the loss.**

*Id*. at 1-2 (transcript citations omitted) (emphasis added).  Plaintiff goes on to assert that, because there is no evidence that anyone other than Raguz knew about his overall fraudulent loan scheme, coverage for Raguz did not terminate under the 2010 Bond.[16]

The Court rejects the circular logic of Plaintiff's argument.  Regardless of how Raguz may have doctored the books to conceal reportable delinquencies, the fact remains that (1) there were reportable delinquencies at St. Paul throughout the relevant time period; and, (2) Raguz knew this but nonetheless submitted false financial reports to both the Board and federal examiners.  Plaintiff's contention that Raguz was not dishonest because he "cured" the non-reportable delinquencies before they became reportable is rejected.  Raguz did not "cure" anything.  He concealed reportable delinquencies through fraud and deception, and then knowingly and repeatedly misrepresented the delinquency rate over a span of multiple years.  The Court has no difficulty in concluding that Raguz's act of falsely reporting zero delinquencies displayed a complete lack of integrity and was dishonest in every sense of the word.

Accordingly, and consistent with the case law cited *supra,* the Court concludes, as a matter of law, that Raguz's submission of financial reports (both to the Board and to federal examiners) that falsely stated St. Paul had a zero delinquency rate, constituted "dishonest" acts for purposes of the Termination provision of the 2010 Bond at issue herein.

The only remaining question, then, is whether Calevich "learned of" this dishonest act.  At trial, Calevich testified on this issue as follows:

Q:      * * *  It's my understanding that for a number– for all of the years that you were president [2005 to 2010], the credit union reported zero delinquency rate.  Do you remember that?

---

[16]  Although the Court does not hold Plaintiff to this in deciding the issue, the Court notes that Plaintiff's counsel conceded during closing argument that reporting a zero delinquency to the Board and the NCUA when there is, in fact, a "reportable" delinquency would be dishonest. (Trial Tr. at 829.)

A:     Yes.

Q:     Okay.  Now, you had been secretary/treasurer for a number of years, I think starting you said in 1999 or 1998 for a number of years.  In fact, you served up until the time you became president, correct?

A:     Yes.

Q:     And during the period of time you were treasurer, there were delinquencies at the credit union, correct?

A:     Yes.

Q:     Okay.  **And then, at some point in time prior to you becoming president, the delinquencies stopped, didn't they, or at least the reported delinquencies –**

**A:     The reported delinquencies stopped.**

**Q:     Okay. And -- and did the Board have any concerns about those allegedly zero delinquency rate?**

**A:     From time to time, yes.**

**Q:     All right. And your concern was that you knew in fact there had to be at least some delinquencies based on your own experience as a member [of St. Paul] and Board member, correct?**

**A:     Yes.**

**Q:     All right. And you raised that issue with Mr. Raguz from time to time, correct?**

**A:     Yes.**

**Q:     And you never got a straight answer as to what was going on, did you?**

**A:     Not a solid answer, no.**

THE COURT:     Not a—

**THE WITNESS:     Not a solid answer that we could rely on.**

(Calevich Test. at tr. 496-497) (emphasis added). Calevich later elaborated as follows:

Q:     Were you aware that despite the zero on the financial statement there were from time to time delinquencies from 2005 to 2010 that were not reported.

Mr. Taylor:     Objection. Asked and answered.

The Court:     Overruled.

23

> A:   From my experience, I would have to assume that there must be something delinquent that wasn't showing up on a report for some reason.
>
>                              * * *
>
> Q:   And didn't you and several other Board members suspect something was very wrong because of that zero – zero delinquency report?
>
> A:   We asked questions about it.
>
> Q:   Did you suspect something was wrong because of those financial reports?
>
> A:   Possibly.

(Calevich Test. at Tr. 498-499.)

Plaintiff asserts Defendant failed to prove "that any officer or director [of St. Paul] had the requisite knowledge." (Doc. No. 191 at 14.) Citing a plethora of federal district and circuit court cases, Plaintiff asserts that "mere suspicion" is not enough and that "the law also requires knowledge of facts that prove dishonest acts occurred [as well as] an appreciation of those facts." *Id*. at 12. Plaintiff does not directly apply this standard in the context of Calevich's testimony. Instead, Plaintiff emphasizes the distinction between non-reportable and reportable delinquencies, noting that the latter only occurred after 60 days of continued delinquency.[17] *Id*. at 15, fn. 17. Plaintiff then argues generally that the absence of reportable delinquencies "was actually perceived as a good sign that St. Paul was economically viable" and was consistent with St. Paul's high percentage of share-secured loans. *Id*. at 15. Plaintiff claims that "it is reasonable and common to simply cure 'non-reportable' delinquencies of share-secured loans prior to them becoming 'reportable' by simply using the 100% collateral backing them." *Id*. at 16. Thus, it appears Plaintiff's argument is that, while Calevich may have been aware that Raguz was reporting a zero delinquency rate, it does not follow that Calevich knew this was

---

[17] There is some confusion about the parties' use of the terms "reportable" and "non-reportable" delinquencies. Based on the testimony introduced at trial, it appears that, when an account became sixty (60) days delinquent, it was reportable to the Board. (Calevich Test. at Tr. 507.) According to Raguz, it was only when an account became ninety (90) days delinquent that it had to be reported to the NCUA. (Raguz Test. at Tr. 148-149.)

dishonest (because the delinquencies may not have risen to the level of "reportable" delinquencies) or that he appreciated the significance of such dishonesty.

As an initial matter, the Court disagrees that, in order to show Calevich "learned of" Raguz's dishonesty, Defendant must show Calevich had "knowledge of facts that prove dishonest acts occurred *and an appreciation of those facts*."  This standard, advocated by Plaintiff, implies Calevich must not only have known Raguz was falsely reporting that St. Paul had a zero delinquency rate, but also must have appreciated that such dishonesty triggered a covered loss under the 2010 Bond.  The Court rejects this standard, as it is essentially tantamount to a finding that Calevich would have to have been "in collusion" with Raguz.  Moreover, the cases cited by Plaintiff for this proposition involve the requisite knowledge for purposes of discovery and/or notice of loss provisions in fidelity bonds.  By definition, these types of bond provisions involve knowledge of an actual loss covered under the bond.

Here, however, the relevant provision (the 2010 Bond's Termination provision) does not hinge on knowledge of dishonest or fraudulent acts that trigger coverage.  Rather, as the Court has already noted, the Termination provision expressly provides that coverage for an employee terminates immediately when a director or officer (not in collusion with such employee) learns of "any dishonest or fraudulent act committed by such 'employee' . . . at any time, **whether or not related to your activities or of the type covered under this Bond**."  (Plaintiff's Exh. B at 069-070) (emphasis added).  Thus, the Court reads this provision as simply requiring that Calevich know that Raguz committed a dishonest act; i.e., any act that shows a want of integrity or breach of trust.  The Court does not construe this provision as further requiring that Calevich appreciate that Raguz's dishonest act triggered coverage under the Bond.  In other words, for purposes of the Termination provision, the Court does not believe that Defendant must show Calevich made the connection between Raguz's falsely reporting a zero delinquency rate and Raguz's overall fraudulent scheme.

With the above principles in mind, the Court finds that, prior to February 10, 2010, Calevich "learned of" a dishonest or fraudulent act committed by Raguz within the meaning of the 2010 Bond's Termination provision.  More specifically, the Court finds that, prior to

25

February 10, 2010, Calevich knew Raguz was submitting financial reports to the Board that reported a zero delinquency rate when, in fact, there were "reportable" delinquencies at St. Paul. This finding is based on the following testimony and evidence presented at trial, which the Court finds credible.

Calevich knew that St. Paul's loan portfolio included not only share-secured loans, but also real estate loans, vehicle loans, and credit card loans.  (Calevich Test. at Tr. 505-506.) Indeed, the NCUA Examination reports (which were provided to Board members, including Calevich) reflected that: (1) as of December 2007, St. Paul reported balances of $2 million in credit card loans; $31 million in real estate loans; $2 million in new and used vehicle loans; and $131.2 million in share-secured (or pledged) loans (Defendant's Exh. 98 at CUMIS 15032-15033); and, (2) as of December 2008, St. Paul reported balances of $1.9 million in credit card loans; $42 million in real estate loans; $1.7 million in new and used vehicle loans; and, $135 million in share-secured loans.  (Defendant's Exh. 99 at CUMIS 15051,15053; Calevich Test. at Tr. 509.)[18]

Calevich knew that non-share-secured loans (such as real estate loans, credit card loans, and vehicle loans) were not as "safe" as share-secured loans.  Indeed, Calevich specifically testified that real estate loans over a certain dollar amount had to be brought to the Board because of their "riskier" nature.  (Calevich Test. at Tr. 505-506.)

Calevich also testified that, during the entire seven year time period that he served as St. Paul's secretary/treasurer (1998 to 2005), there were delinquencies at St. Paul.  (Calevich Test. at Tr. 496.)  The Board, including Calevich, became concerned when the reported delinquencies suddenly "stopped."  *Id.*  This was because, based on his long-time experience as a Board

---

[18] In addition, the minutes from the Board's Monthly Meetings expressly discuss St. Paul's "visa balance," i.e., the outstanding balance on visa credit card loans.  (Defendant's Exhs. 8-74.)  Further, minutes from monthly meetings between January 2005 and March 2006 reflect that real estate loans were often brought to the Board's attention for approval.  (Defendant's Exhs. 8- 34.)  For example, in January 2005, three new real estate loans totaling $415,000 were presented to the Board and recommended for approval.  (Defendant's Exhs. 8, 9.)  As noted *supra*, Calevich was present at all but three of the monthly meetings between January 2005 and January 2010.

member, Calevich "knew in fact there had to be at least some delinquencies" at St. Paul. (Calevich Test. at Tr. 496-497.)  The Board was so concerned, in fact, that it raised this issue directly with Raguz "from time to time," which implies the Board questioned Raguz regarding the zero delinquency rate on more than one occasion.  *Id.*  Raguz, however, never provided a "solid answer that [the Board] could rely on."  *Id.* at 497.

Taken as a whole, the above testimony and evidence shows that Calevich knew Raguz was falsely representing that St. Paul had a zero delinquency rate in financial reports to the Board.  As set forth above, Calevich's twenty-six years as a Board member provided him extensive familiarity with the composition and nature of St. Paul's loan portfolio.  It is undisputed that Calevich knew St. Paul carried tens of millions of dollars in non-share secured loans throughout the relevant time period.  Moreover, Calevich's trial testimony establishes that he knew such non-share secured loans were inherently "riskier" (i.e., subject to delinquency) than share-secured loans.  Indeed, Calevich acknowledged there were always delinquencies at St. Paul while he was secretary/treasurer.  The Court finds this testimony credible, and notes it is consistent with long-time Board member Joe Plavac's testimony that, between 1986 and 2001, there were delinquencies "each and every month and year at St. Paul's" at a rate of 1 to 2 %. (Plavac Test. at Tr. 546-547.)

Significantly, when "the reported delinquencies [suddenly] stopped," Calevich testified he became concerned because he "**knew, in fact, there had to be at least some delinquencies**" based on his own experience as a Board member.  (Calevich Test. at Tr. 496-497.)  Indeed, when asked if he was aware that there were delinquencies between 2005 and 2010 despite "the zero on the financial statement," Calevich acknowledged that he "would have to assume that there must be something delinquent."  *Id.* at 498.  The Court finds that this testimony, combined with Raguz's subsequent refusal to provide a "solid answer" in response to the Board's inquiries about the sudden lack of reportable delinquencies, establishes that Calevich "learned of" Raguz's

dishonesty within the meaning of the 2010 Bond's Termination provision.[19]

In so finding, the Court rejects Plaintiff's suggestion that Calevich did not "learn of" Raguz's dishonest act because it was reasonable to have assumed there were no "reportable" delinquencies in light of the fact that the majority of St. Paul's loans were share-secured. Plaintiff's argument that "it is reasonable and common to simply cure 'non-reportable' delinquencies of share-secured loans prior to them becoming 'reportable' by simply using the 100% collateral backing them" may or may not be true.  However, it does not account for the fact that St. Paul's loan portfolio included tens of millions of dollars in non-share secured loans. Indeed, Plaintiff's distinction between "non-reportable" and "reportable" delinquencies collapses when one considers the sheer dollar volume of St. Paul's real estate loans during the relevant time period, particularly in light of the state of the economy during the years leading up to the liquidation of St. Paul in 2010.

Moreover, Calevich testified that "[w]hen a borrower is two months behind in his payments, it becomes reportable to the Board."  (Calevich Test. at Tr. 507.)  Thus, even if delinquencies did not become reportable to the NCUA, Calevich's testimony establishes that accounts were required to be brought before the Board when they were 60 days delinquent.  The Board, therefore, should have had knowledge of  delinquencies even if they did not reach the point of being "reportable" to federal examiners and included in St. Paul's deliquency ratio.

Finally, the Court finds that Calevich learned of Raguz's dishonest act (i.e., providing false financial reports to the Board) prior to the February 2010 effective date of the Bond. Although Calevich's testimony does not establish a precise date on which he became aware of Raguz's dishonesty in this regard, the Court construes the testimony and evidence as a whole as indicating that Calevich learned Raguz was submitting false financial reports to the Board well prior to February 2010.  This conclusion is supported by the lengthy time period over which Raguz falsified his financial reports to the Board (at a minimum, from 2005 to 2010), combined

---

[19] The Court is in no way suggesting that Calevich was aware of the criminal activity Raguz was engaged in.  Knowing that there were "reportable" delinquencies is not the same as knowing there was criminal conduct.

with Calevich's testimony that he raised this issue with Raguz on several occasions.

Having said this, the Court does not want to suggest that Mr. Calevich was the only Board member with such knowledge.  Of the two Board members to testify, Calevich was the most forthcoming.  However, Plavac, a Board member for over fifty years, also testified that from 1986 to 1995 (when he was the full-time manager of St. Paul) there were delinquencies each and every month at a rate of one or two percent.  (Plavac Test. at Tr. 546-547)  Plavac acknowledged these delinquencies continued from 1995 to 2001 while Raguz was manager. (Plavac Test. at Tr. 547, 550.)  However, thereafter, beginning in 2002, zero delinquencies were reported.  (Plavac Test. at Tr. 549, 552.)  Despite this abrupt change, Mr. Plavac testified he did not "know" there actually were delinquencies because he did not ask to see the monthly reports. (Plavac Test. at Tr. 550-551, 554-555.)  Mr. Plavac testified that, from time to time, he discussed concerns with other Board members about the amount of share-secured loans and questioned Raguz about both share-secured loans and delinquencies. (Plavac Test. at Tr. 555-557, 558-559, 563, 565.)  Plavac, however, claimed to be unable to recall any specifics.  (Plavac Test. at Tr. 556-557.)  In the Court's view, Plavac simply appeared to be unwilling to acknowledge that he knew what had to have been obvious to a long-time Board member such as himself; i.e., that Raguz was falsely disclosing zero reportable delinquencies.  Under the circumstances, the Court concludes that, if nothing else, the "Board" as a whole was at least willfully blind to Raguz's dishonesty.

Accordingly, and for all the reasons set forth above, the Court concludes that, prior to February 2010, at least one Board member (i.e., Calevich) "learned of" a dishonest or fraudulent act committed by Raguz within the meaning of the 2010 Bond's Termination provision. Therefore, coverage for Raguz terminated prior to the February 10, 2010 effective date of the Bond.  Because it is undisputed that all of the loss claimed in the instant case was caused by Raguz, and there was no coverage for him under the Bond on which Plaintiff has sued, the Court further concludes that Plaintiff is not entitled to a declaration of coverage for losses arising from

employee or director dishonesty as a matter of law.[20]

## IV.  Conclusion

Accordingly, and for all the reasons set forth above, the Court concludes, as a matter of law, that Plaintiff is not entitled to a declaration of coverage for losses under the 2010 Bond issued to St. Paul by Defendant, for losses arising from employee or director dishonesty.

.       IT IS SO ORDERED.


/s/ Greg White
U.S. Magistrate Judge

Date: January 14, 2016

---

[20]  Because the Court decides this case on the basis of the Termination provision, it need not reach Defendant's arguments that Raguz abdicated his status as an "employee" under the 2010 Bond, or that Plaintiff failed to come forward with admissible evidence documenting $5 million in compensable losses.  Nor need the Court reach the Defendant's arguments regarding discovery of the loss and Plaintiff's alleged failure to provide timely written notice of the loss.